2003 WY 96

**Edward A. FENDER, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 02–29.

Supreme Court of Wyoming.

Aug. 19, 2003.

Representing Appellant: Kenneth M. Koski, Public Defender; Donna D. Domonkos, Appellate Counsel; and Will Bierman, Deputy Public Defender.

Representing Appellee: Hoke MacMillan, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and Georgia L. Tibbetts, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] Edward A. Fender (appellant) entered a conditional "no contest" plea to possession of marijuana in violation of Wyo. Stat. Ann. § 35–7–1031(c)(i)(A) (LexisNexis 2003), a misdemeanor. On appeal, appellant challenges the district court's denial of his motion to suppress a baggie of marijuana seized from his pants pocket. We affirm.

## ISSUES

[¶ 2] Appellant phrases the issues on appeal as follows:

Whether the trial court erred when it denied Mr. Fender's motion to suppress because (1) his presence as a passenger in a car in which two other occupants were arrested on outstanding warrants for failure to appear did not provide reasonable articulable suspicion to warrant a pat-down search and (2) the pocket bulge seen and felt by the officer could not have appeared to be a weapon?

*The State phrases the issue thus: "Did the district court err in denying appellant's motion to suppress?"*

### FACTS

[¶ 3] At approximately 7:19 p.m. on June 30, 2001, Wyoming Highway Patrol Trooper Douglas Deskin (Deskin) stopped a gold Chrysler Sebring for speeding on Wyoming Highway 113 in Crook County.[1] The vehicle contained four male occupants. Deskin contacted the driver, Michael Stensland (Stensland), age eighteen, who informed the officer that he did not have a driver's license with him, but provided the officer his name and date of birth. Deskin noticed a "slight odor" of alcohol about Stensland, and in determining whether Stensland had a valid driver's license, Deskin discovered an active "failure to appear" warrant for Stensland's arrest in Crook County. Deskin requested backup assistance, and once another officer arrived, Deskin approached Stensland, informed him of the warrant, arrested him, and placed him into Deskin's patrol vehicle.

[¶ 4] Stensland stated that he wanted the Sebring's right rear passenger to drive the Sebring in Stensland's absence. That passenger, Nathan Luth (Luth), age nineteen, provided Deskin a driver's license, and in determining whether the license was valid,[2] Deskin discovered an active "failure to appear" warrant for Luth's arrest in Campbell County. Deskin noticed a "smell" of alcohol about Luth, informed him of the warrant, and arrested him. In searching Luth's person, Deskin discovered ZigZag paper and a "warm" tin can containing a green leafy substance Deskin believed to be marijuana and the endings of three joints, a "little smoke coming off of the butts as if they were just smoked." Deskin had Luth sit on the ground near the right front of Deskin's patrol vehicle.

[¶ 5] For "officer safety," Deskin then contacted the Sebring's left rear passenger, appellant, age twenty-one, while the other officer simultaneously contacted the Sebring's right front passenger, Rickie Fischer (Fischer). Appellant gave Deskin a South Carolina driver's license. Deskin asked appellant to "step out" of the vehicle and at some point placed appellant in handcuffs for "officer safety." Deskin then overheard that the other officer had discovered an active "failure to appear" warrant for Fischer's arrest in Campbell County.

[¶ 6] Deskin decided to initiate a "pat down search" of appellant "to see if he had any weapons or anything that could" be "used against" the officers. Deskin visually noticed a bulge in appellant's left front pocket. Deskin testified as follows regarding his pat-down of appellant's pants:

Q. What did you feel when you did that?

A. There was a bulge in the front of his pants that could have been almost anything. It could resemble anything from loose change to something within his pants to a knife. I had no idea what it was.

Q. So what did you do?

A. I reached inside to determine what was inside of his pants and pulled out a baggy full of green leafy material which I recognized from my training as marihuana.

Appellant was ultimately arrested. A search of the vehicle yielded two twelve-packs of beer, a marijuana pipe or paraphernalia, and a baggy containing a crystal substance later identified as tree resin. According to Deskin, appellant admitted that the pipe was his.

---

1. According to Deskin, due to a fireworks display at Keyhole Reservoir on that date, he was patrolling Highway 113 with stationary radar. Highway 113 is a "byway from U.S. 14 to Pine Haven or also to the reservoir."

2. Deskin "wanted to make sure he has a valid driver's license so that he can drive the car. I didn't want somebody who was suspended or had an expired license to operate that vehicle."

[¶ 7] Appellant moved to suppress the baggie Deskin discovered in appellant's pants pocket. After a hearing, during which hearing the district court heard Deskin's testimony and trial counsel's argument based on that testimony, the district court denied the motion. The district court found that the search "for weapons was a reasonable search under the circumstances" and, relying on *Perry v. State*, 927 P.2d 1158 (Wyo.1996), stated that the "concern for officer safety in the context of a lawful arrest allows an officer the right to frisk companions of an arrestee for the possible concealment of weapons."

[¶ 8] Appellant subsequently entered a conditional "no contest" plea (preserving his right to appeal the district court's suppression ruling) to possession of marijuana in violation of Wyo. Stat. Ann. § 35–7–1031(c)(i)(A), a misdemeanor, and appeals from the judgment and sentence issued pursuant to that plea.

### STANDARD OF REVIEW

[¶ 9] Our standard of review is as follows:

Findings on factual issues made by the district court considering a motion to suppress are not disturbed on appeal unless they are clearly erroneous. *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994). Since the district court conducts the hearing on the motion to suppress and has the opportunity to assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions, evidence is viewed in the light most favorable to the district court's determination. *Id.* The issue of law, whether an unreasonable search or seizure has occurred in violation of constitutional rights, is reviewed de novo. *Id.; Brown v. State*, 944 P.2d 1168, 1170–71 (Wyo.1997).

*McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999).

**3.** Wyo. Const. art. 1, § 4 provides:
  The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches and seizures shall not be

### DISCUSSION

[¶ 10] Appellant argues that Deskin's patdown of appellant was based on "no more than [appellant's] association" with the vehicle's other occupants, not a reasonable articulable suspicion that appellant was armed or dangerous, and therefore violated the Fourth Amendment to the United States Constitution and Wyo. Const. art. 1, § 4. A great deal of appellant's argument concerns the propriety of evaluating the circumstances of the instant case according to what appellant characterizes as a literal or categorical application of the so-called " 'automatic-companion rule' " referenced in *Perry*, 927 P.2d 1158, as opposed to a "totality of the circumstances" approach, which approach appellant advocates. However, the State does not argue that the pat-down of appellant was justified by a literal or categorical application of the automatic companion rule, but rather that the pat-down was reasonable under the totality of the circumstances.

[¶ 11] We will first resolve appellant's arguments regarding Wyo. Const. art. 1, § 4.[3] "A state constitutional analysis is required unless a party desires to have an issue decided solely under the Federal Constitution." *Damato v. State*, 2003 WY 13, ¶ 8, 64 P.3d 700, 704 (Wyo.2003). Appellant argues that a "categorical" approach based on the automatic companion rule is inconsistent with Wyo. Const. art. 1, § 4 because in *Vasquez v. State*, 990 P.2d 476 (Wyo.1999), this Court interpreted that section to provide greater protection than the Fourth Amendment to the United States Constitution and rejected a bright-line or categorical approach in favor of a totality of the circumstances approach. Since the State has not advocated for such a categorical approach, we need not address this argument.

[¶ 12] Appellant also summarily argues that merely because Wyo. Const. art. 1, § 4 has been interpreted to provide greater protection than the Fourth Amendment to the United States Constitution based on the issues presented in *Vasquez*, Deskin's pat-

violated, and no warrant shall issue but upon probable cause, supported by affidavit, particularly describing the place to be searched or the person or thing to be seized.

down in the instant case violated the Wyoming Constitution. Appellant's analysis on this issue does not constitute the "precise, analytically sound approach [required] when advancing an argument to independently interpret the state constitution." *Vasquez*, 990 P.2d at 484. A failure to present proper argument supporting " 'adequate and independent state grounds,' ... prevents this court, as a matter of policy, from considering other than the federal constitutional principles at issue...." *Wilson v. State*, 874 P.2d 215, 219 (Wyo.1994) (*quoting Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983)). *See also Meek v. State*, 2002 WY 1, ¶ 7 n. 2, 37 P.3d 1279, 1282 n. 2 (Wyo.2002).

[¶ 13] The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures...." U.S. Const. amend. IV. Generally, the "three tiers of police-citizen encounters" include

> "communication between police and citizens involving no coercion or detention and therefore without the compass of the Fourth Amendment, brief 'seizures' that must be supported by reasonable suspicion, and full-scale arrests that must be supported by probable cause."

*Perry*, 927 P.2d at 1163 (*quoting United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982)).

> An investigatory or *Terry* stop represents a seizure which implicates the Fourth Amendment, requiring the presence of specific, articulable facts and rational inferences giving rise to a reasonable suspicion that a person has committed or may be committing a crime. *Wilson v. State*, 874 P.2d 215, 219–220 (Wyo.1994) (citing *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)); *see also McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999). There is a dual inquiry for evaluating the reasonableness of an investigatory stop: (1) whether the officer's actions were justified at the inception; and (2) whether it was reasonably related in scope to the circumstances which justified the interference in the first instance. *Wilson*, 874

P.2d at 223 (quoting *United States v. Hensley*, 469 U.S. 221, 228, 105 S.Ct. 675, 680, 83 L.Ed.2d 604 (1985) and *Terry*, 392 U.S. at 20–21, 88 S.Ct. at 1879)). The conduct of an officer is judged by an objective standard which takes into account the totality of the circumstances. *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1879–81; *United States v. Lang*, 81 F.3d 955, 965 (10th Cir.1996).

*Putnam v. State*, 995 P.2d 632, 637 (Wyo. 2000). Appellant does not question the propriety of the initial stop or whether Deskin's actions were justified at the inception of the encounter.

[¶ 14] In making a routine traffic stop,

> "a law enforcement officer may: request a driver's license and vehicle registration; run a computer check; and issue a citation." *Burgos–Seberos v. State*, 969 P.2d 1131, 1133 (Wyo.1998) (citing *United States v. Elliott*, 107 F.3d 810, 813 (10th Cir.1997)); *see also, Wilson*, 874 P.2d at 224. Generally, the driver must be allowed to proceed without further delay once the officer determines that the driver has a valid license and is entitled to operate the vehicle. *Burgos–Seberos*, 969 P.2d at 1133. "In the absence of the particular individual's valid consent, an officer may expand an investigative detention only if there exists an 'objectively reasonable and articulable suspicion' that criminal activity has occurred or is occurring." *United States v. Williams*, 271 F.3d 1262, 1267 (10th Cir.2001), *cert. denied*, 535 U.S. 1019, 122 S.Ct. 1610, 152 L.Ed.2d 624 (2002) (citing *United States v. Hunnicutt*, 135 F.3d 1345, 1349 (10th Cir.1998))....

> ... [A]n officer ... may conduct a patdown search if he or she harbors an articulable and reasonable suspicion that the person is armed and dangerous. *Knowles v. Iowa*, 525 U.S. 113, 117–18, 119 S.Ct. 484, 488, 142 L.Ed.2d 492 (1998) (citing [*Pennsylvania v.*] *Mimms*, 434 U.S. [106] at 111, 98 S.Ct. [330] at 334–35 [54 L.Ed.2d 331 (1977) ], and *Terry*, 392 U.S. at 27, 88 S.Ct. at 1883)....

> ...

We find that the analysis of the factors supporting reasonable suspicion should be governed by *United States v. Wood,* 106 F.3d 942 (10th Cir.1997). As the Tenth Circuit stated in *Wood,* we must determine if the totality of the circumstances demonstrates the existence of objectively reasonable suspicion.... *Id.* at 946.

> "The 'whole picture' must be taken into account. Common sense and ordinary human experience are to be employed, and deference is to be accorded a law enforcement officer's ability to distinguish between innocent and suspicious actions. Inchoate suspicions and unparticularized hunches, however, do not provide reasonable suspicion. Even though reasonable suspicion may be founded upon factors consistent with innocent travel, some facts must be outrightly dismissed as so innocent or susceptible to varying interpretations as to be innocuous. We therefore examine, both individually and in the aggregate, the factors found by the trooper and the district court to give rise to reasonable suspicion to detain...."

*Id. ...*

The Court has said:

> "Articulating precisely what 'reasonable suspicion' and 'probable cause' mean is not possible. They are commonsense, nontechnical conceptions that deal with ' "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." ' *Illinois v. Gates,* 462 U.S. 213, 231, 103 S.Ct. 2317, 2328, 76 L.Ed.2d 527 (1983) (quoting *Brinegar v. United States,* 338 U.S. 160, 175, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)); see *United States v. Sokolow,* 490 U.S. 1, 7–8, 109 S.Ct. 1581, 1585–1586, 104 L.Ed.2d 1 (1989). As such, the standards are 'not readily, or even usefully, reduced to a neat set of legal rules.' *Gates, supra,* at 232, 103 S.Ct. at 2329. We have described reasonable suspicion simply as "a particularized and objective basis" for suspecting the person stopped of criminal activity, *United States v. Cortez,* 449 U.S. 411, 417–418, 101 S.Ct. 690, 694–696, 66 L.Ed.2d 621 (1981), and probable cause to search as existing where the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found, see *Brinegar, supra,* at 175–176, 69 S.Ct. at 1310–1311; *Gates, supra,* at 238, 103 S.Ct. at 2332."

*Ornelas v. United States,* 517 U.S. 690, 695–96, 116 S.Ct. 1657, 1661, 134 L.Ed.2d 911 (1996).

The Tenth Circuit has recently distinguished between reasonable suspicion and probable cause:

> "Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause."

*United States v. Tuter,* 240 F.3d 1292, 1296 n. 2 (10th Cir.), *cert. denied,* 534 U.S. 886, 122 S.Ct. 195, 151 L.Ed.2d 137 (2001) (citing *Alabama v. White,* 496 U.S. 325, 330, 110 S.Ct. 2412, 110 L.Ed.2d 301 (1990)).

*Damato,* 2003 WY 13, ¶¶ 13–18, 64 P.3d at 706–08.

[¶ 15] Deskin stopped the vehicle, containing four male occupants traveling together, for speeding at an evening hour on what appears to have been a rural highway in Crook County. The officer determined that the driver, age eighteen, and the right rear passenger, age nineteen, were both subjects of active arrest warrants. Both individuals also smelled of alcohol, and the right rear passenger possessed a tin can containing suspected marijuana and the endings of three "joints" with "smoke coming off of the butts as if they were just smoked."

[¶ 16] Deskin asked appellant, the left rear passenger, to step out of the vehicle and appellant produced a South Carolina driver's license. An "officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Mary-*

*land v. Wilson,* 519 U.S. 408, 415, 117 S.Ct. 882, 886, 137 L.Ed.2d 41 (1997).

On the public interest side of the balance, the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or passenger. Regrettably, traffic stops may be dangerous encounters.... In the case of passengers, the danger of the officer's standing in the path of oncoming traffic would not be present except in the case of a passenger in the left rear seat, but the fact that there is more than one occupant of the vehicle increases the possible sources of harm to the officer.

On the personal liberty side of the balance, the case for the passengers is in one sense stronger than that for the driver. There is probable cause to believe that the driver has committed a minor vehicular offense, but there is no such reason to stop or detain the passengers. But as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change in their circumstances which will result from ordering them out of the car is that they will be outside of, rather than inside of, the stopped car. Outside the car, the passengers will be denied access to any possible weapon that might be concealed in the interior of the passenger compartment. It would seem that the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop. And the motivation of a passenger to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver.

. . .

In summary, danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car. While there is not the same basis for ordering the passengers out of the car as there is for ordering the driver out, the additional intrusion on the passenger is minimal.

*Id.* at 413–15, 117 S.Ct. 882 (footnote omitted).

[¶ 17] At some point thereafter, Deskin also placed appellant in handcuffs for "officer safety." Appellant does not argue that placing appellant in handcuffs transformed the encounter to that of a full-scale arrest and, except for one isolated, conclusory statement in his appellate brief, appellant does not otherwise question the officer's use of handcuffs.

In *Terry,* the Supreme Court of the United States forcefully relied upon the necessity to preserve officer safety in potentially explosive situations:

"In addition [to the government's interest in investigating crime], there is ***the more immediate interest of the police officer in taking steps to assure himself that the person with whom he is dealing is not armed with a weapon that could unexpectedly and fatally be used against him.*** Certainly it would be unreasonable to require that police officers take unnecessary risks in the performance of their duties."

*Terry,* 392 U.S. at 23, 88 S.Ct. at 1881[.] *Perry,* 927 P.2d at 1164 (emphasis in original). " 'Since police officers should not be required to take unnecessary risks in performing their duties, they are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and maintain the status quo during the course of [a *Terry* ] stop." ' " *Putnam,* 995 P.2d at 637–38 (*quoting United States v. Lang,* 81 F.3d 955, 966 (10th Cir.1996)); *see also United States v. Shareef,* 100 F.3d 1491, 1502 (10th Cir.1996). Because "safety may require the police to freeze temporarily a potentially dangerous situation, both the display of firearms and the use of handcuffs may be part of a reasonable *Terry* stop." *United States v. Merkley,* 988 F.2d 1062, 1064 (10th Cir.1993).

"[T]he use of firearms, handcuffs, and other forceful techniques does not necessarily transform a *Terry* detention into a full custodial arrest—for which probable cause is required—when the circumstances reasonably warrant such measures." *United States v. Melendez–Garcia,* 28 F.3d 1046, 1052 (10th Cir.1994).... Such measures are warranted however, only if "the facts available to the officer would warrant a

man of reasonable caution in the belief that the action taken was appropriate." *Id.*
. . . .

*Shareef,* 100 F.3d at 1502; *see also Eckenrod v. State,* 2003 WY 51, ¶ 16, 67 P.3d 635, 640 (Wyo.2003); *Brown v. State,* 944 P.2d 1168, 1172 (Wyo.1997); and *United States v. Perdue,* 8 F.3d 1455, 1462–63 (10th Cir.1993). In determining whether an officer's conduct during an investigatory stop is reasonable, a court " 'should take care to consider whether police are acting in a swiftly developing situation, and in such cases the court should not indulge in unrealistic second-guessing.' " *Shareef,* 100 F.3d at 1505 (*quoting United States v. Sharpe,* 470 U.S. 675, 686, 105 S.Ct. 1568, 1575, 84 L.E.2d 605 (1985)). A *"Terry* investigation . . . involves a police investigation 'at close range,' *Terry,* 392 U.S., at 24, 88 S.Ct. 1868, when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a 'quick decision as to how to protect himself and others from possible danger. . . .' " *Long,* 463 U.S. at 1052, 103 S.Ct. 3469 (emphasis in original).

[¶ 18] Considering the totality of the circumstances at this point in the encounter, and especially appellant's lack of cogent argument on the issue, we do not feel compelled to second-guess the officer's decision in the instant case that his safety required briefly handcuffing appellant. We also note how apparently swiftly the situation developed from a stop for a speeding violation to one involving alcohol consumption, evidence of marijuana use and possession, and the officer's discovery that first the driver, and also the right rear passenger, were the sub-

jects of active arrest warrants. Our consideration of these circumstances does not mean that law enforcement is automatically authorized to employ restrictive procedures of this nature in every investigatory detention.

[¶ 19] Deskin then learned that the right front passenger, too, was the subject of an active arrest warrant, and also visually noticed a suspicious bulge in appellant's left front pocket. By this time, the existing circumstances included the following:

1. Deskin stopped the vehicle for speeding at an evening hour on what appears to have been a rural highway.

2. The vehicle contained four male occupants. Until appellant was ultimately arrested for the instant offense, only two law enforcement officers were present during the encounter with the vehicle's four occupants.

3. The four occupants were traveling together in the confined space of the vehicle and were expecting "a good evening at the lake . . . ." The driver, age eighteen, and the right rear passenger, age nineteen, smelled of alcohol. The right rear passenger possessed a "warm" can containing suspected marijuana and the ends of *three* "joints" with smoke coming off them "as if they were just smoked." Appellant was the left rear passenger.[4]

4. The vehicle's driver, right front passenger, and right rear passenger were the subjects of active arrest warrants for failure to appear.

5. In close proximity to appellant, Deskin visually noticed a suspicious bulge in appel-

---

4. "It is logical and completely reasonable to infer that a person under the influence may be more likely to commit an impulsive violent act against a police officer than one who is sober." *State v. McGill,* 2000 WI 38, ¶ 31, 234 Wis.2d 560, 609 N.W.2d 795, 803, *cert. denied,* 531 U.S. 906, 121 S.Ct. 250, 148 L.Ed.2d 180 (2000). The Wisconsin Supreme Court went on to state that the "odor of intoxicants and marijuana (and the commonsense inference that the defendant was under the influence and therefore potentially more dangerous to the officer) represents only one piece of the total factual picture here and therefore only part of the . . . justification for this frisk." *Id.,* 2000 WI 38, ¶ 31 n. 3, 609 N.W.2d at 803 n. 3. Similarly, if an individual had been

consuming alcoholic beverages, "his judgment might have been impaired and his inhibitions reduced. In such a state [he] might be more likely to resort to violence as a perceived solution to the apparent impending . . . investigation." *United States v. Sanders,* 994 F.2d 200, 207 (5th Cir.), *cert. denied,* 510 U.S. 955, 114 S.Ct. 408, 126 L.Ed.2d 355, *cert. denied,* 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 572 (1993).

*See generally United States v. Hishaw,* 235 F.3d 565, 570–71 (10th Cir.2000), *cert. denied,* 533 U.S. 908, 121 S.Ct. 2254, 150 L.Ed.2d 241 (2001) and *People v. Hardrick,* 60 P.3d 264, 267–68 (Colo.2002) ("although no weapons were found at the scene, drugs were found, thus increasing the risk of violence").

lant's left front pocket.[5]

[¶ 20] We find that the totality of the circumstances, and the rational inferences accompanying them, objectively demonstrate the requisite level of suspicion for Deskin to have determined whether appellant indeed possessed a weapon of some kind. Such a pat-down "necessitates a limited intrusion extending to 'the officer the power to take necessary measures to determine whether the person is in fact carrying a weapon and to neutralize the threat of physical harm.'" *Perry,* 927 P.2d at 1164 (*quoting Terry v. Ohio,* 392 U.S. 1, 24, 88 S.Ct. 1868, 1881, 20 L.Ed.2d 889 (1968)). Accordingly, Deskin acted reasonably in conducting the pat-down of appellant's pants, and it did not exceed the scope of the circumstances which justified the interference.

> "The officer need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.... And in determining whether the officer acted reasonably in such circumstances, due weight must be given ... to the specific reasonable inferences which he is entitled to draw from the facts in light of his experience."

*Putnam,* 995 P.2d at 637 (*quoting Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

[¶ 21] Appellant next argues that even if Deskin acted reasonably in conducting the pat-down, the officer "had no basis to extend that into a search of [appellant's] pocket and a seizure of its contents." According to appellant, neither Deskin's "description of what he felt, nor what he actually removed from [appellant's] pocket, supports the conclusion that *before* he searched the pocket he believed it contained a weapon." (Emphasis in original.)

[¶ 22] In *Perry,* 927 P.2d at 1164–65, we stated the following:

> The pat-down search itself, however, must "be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." *Terry,* 392 U.S. at 29, 88 S.Ct. at 1884.
>
> The law does not require the officer to be absolutely certain the object felt is a weapon. A leading treatise sets out the appropriate standard.
>
> > "Under the better view, then, a search is not permissible when the object felt is soft in nature. If the object felt is hard, then the question is whether its 'size or density' is such that it might be a weapon. But because 'weapons are not always of an easily discernable shape,' it is not inevitably essential that the officer feel the outline of a pistol or something of that nature. Somewhat more leeway

5. But assume arguendo that we were now to hold that, under *Terry,* the police could not frisk [an individual] once he was handcuffed; and further assume that the police could not otherwise develop probable cause sufficient to arrest him, but that they still had reasonable grounds to believe that he was armed and presently dangerous. What options would remain? Clearly, the police could not keep [the individual] handcuffed indefinitely. But neither could they simply remove the handcuffs, for then the danger would return in full force, again justifying the officers' frisking of [the individual] for weapons. Continuing, if the officers were again to handcuff [the individual] so that they could accomplish the frisk in relative safety, the danger justifying a frisk would again cease to exist. The circular nature of this premise is obvious and need not be pursued ad absurdum, for it is built on a flawed foundation.

[The] argument is entirely dependent on the assumption that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm. As is sadly borne out in the statistics for police officers killed and assaulted in the line of duty each year, however, this assumption has no basis in fact.

Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability to perform various acts. They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick. Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain. Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion.

*Sanders,* 994 F.2d at 209 (footnotes omitted).

must be allowed upon 'the feeling of a hard object of substantial size, the precise shape or nature of which is not discernible through outer clothing,' * * *."

Wayne R. Lafave & Jerold H. Israel, Search and Seizure § 9.5(c) (3d ed.1996). In *Perry,* the officer "encountered a hard object, approximately five inches long and three-quarters of an inch wide" and testified that he "didn't know" if the object was a weapon. *Perry,* 927 P.2d at 1164. We found that because the object the officer encountered was "a hard object of substantial size" with an imprecise shape or nature "not discernable through outer clothing," the object "reasonably could have been a weapon" and the officer was "justified in determining whether it was or not." *Id.* at 1165.

[¶ 23] The district court found in the instant case that Deskin discovered a "large bulge" in appellant's left front pocket. Deskin did not testify that the bulge was "large" per se, but that the bulge he felt "could resemble anything from loose change to something within his pants to a knife." Although more precise testimony would have been helpful in evaluating this issue, it is rational to infer from the officer's testimony that the object in appellant's pants pocket was hard (the object felt as if it could have been loose change or a knife, both of which items possess characteristics indicative of a hard object), was of a size or density that it could have been a knife, and that the object's precise shape or nature was not discernible through appellant's clothing. Based on the facts presented in the instant case, we conclude that the object reasonably could have been a weapon such as some form of a knife, and Deskin was justified in determining whether it was indeed a weapon.

[¶ 24] Affirmed.

GOLDEN, J., dissenting.

[¶ 25] Although I agree with the Court's opinion on the first issue, I respectfully disagree with its opinion on the second issue. Officer Deskin testified that when he patted down Mr. Fender he felt "a bulge ... that could have been almost anything ... from loose change to something within his pants to

a knife. I had no idea what it was." Without further probing the contour or mass of the unseen but felt object until he negated the possibility that Mr. Fender possessed a knife or some other such obvious weapon that Mr. Fender could use to harm the officer, which additional probing is not prohibited by *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), Officer Deskin reached into Mr. Fender's pocket and pulled out a baggy containing a green leafy substance.

[¶ 26] I agree with the Court's statement that "more precise testimony would have been helpful in evaluating this issue." I disagree with the Court's statement that "it is rational to infer from the officer's testimony that the object in [Mr. Fender's] pants pocket was hard (the object felt as if it could have been loose change or a knife, both of which items possess characteristics indicative of a hard object), was of a size or density that it could have been a knife...." I disagree that it is rational to infer from the officer's ambiguous and equivocal testimony that the object was hard. The officer testified that the bulge "could have been *almost anything* from ... loose change to *something within his pants* to a knife. I had *no idea what it was.*" (Emphasis supplied). The officer's testimony reveals nothing about the object's size, shape, density or rigidity. Because the test is an objective one, I am unable to conclude from such ambiguous and equivocal testimony that a reasonable officer in those circumstances would have believed that the item could likely be a weapon.

