2004 WY 129

**Donald S. MACKRILL, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 03–101.

Supreme Court of Wyoming.

Nov. 3, 2004.

Representing Appellant: Kenneth M. Ko-
ski, Public Defender; Donna D. Domonkos,

Appellate Counsel; and Tina N. Kerin, Senior Assistant Appellate Counsel.

Representing Appellee: Patrick J. Crank, Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Georgia L. Tibbetts, Senior Assistant Attorney General; and Peggy A. Trent, Senior Assistant Attorney General.

Before HILL, C.J., and GOLDEN, LEHMAN, KITE, and VOIGT, JJ.

VOIGT, Justice.

[¶ 1] The appellant, Donald S. Mackrill, argues that the district court erred in denying a motion to suppress his statements to law enforcement officers and the evidence seized from his automobile. In particular, the appellant contends on appeal that law enforcement officers were required to advise him in accordance with *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) (hereinafter *Miranda*) before asking him about the presence of weapons in his automobile. We find that the circumstances of the instant case implicate the "public safety" exception to the *Miranda* rule, and we affirm the district court's denial of the suppression motion.

## ISSUE

[¶ 2] Whether, under the circumstances, law enforcement officers were required to advise the appellant in accordance with *Miranda* prior to asking him about the presence of weapons in his automobile?

## FACTS

[¶ 3] On April 5, 2002, Cheyenne police officer Patrick Kailey assisted federal Bureau of Alcohol, Tobacco, and Firearms (ATF) agents and Arizona authorities in arresting Chad Schaub (Schaub). Schaub was the subject of a federal felony arrest warrant

for possessing ten pipe bombs, "drugs[,] and drug paraphernalia,"[1] and was wanted for questioning as "a possible suspect or a relevant witness" in connection with the attempted murder of an assistant district attorney in Arizona. The officers considered Schaub to be "very dangerous" and "possibly armed," and they had information that Schaub "had partaken in that kind of violent behavior before." The officers also knew that Schaub was "with other individuals"[2] and that the appellant in particular "had been with Mr. Schaub" for "quite some time before our arrival...." However, Officer Kailey had no specific information that the appellant was dangerous, independent of his association with Schaub, or was suspected of having committed a criminal offense.

[¶ 4] Around 5:00 p.m., Officer Kailey learned that Schaub was likely at an automobile body shop on East Pershing Boulevard in Cheyenne, which location was near a restaurant and a bank. The officers proceeded to surveil the body shop from about two blocks away and observed a pickup parked in the parking lot approximately sixty to one hundred feet from the body shop. After watching the location for thirty or forty minutes, other officers notified Officer Kailey that a "male subject had walked from the north side of the building around to the parking lot and had entered the driver's door of the vehicle in the parking lot," removed something from the vehicle, and returned to the north side of the building; the male subject was not Schaub. Although the officers did not know it at the time, the pickup belonged to the appellant.

[¶ 5] At some point, Officer Kailey was notified that "three subjects, including [Schaub], were walking south through the parking lot and approaching the pickup." The other two individuals were ultimately identified as the appellant and Schaub's cousin, who worked at the body shop. For "safe-

---

**1.** According to ATF agent Daniel Raponi, Schaub was "pulled over in a van with three other individuals [in the Phoenix area]. I believe they found drugs and drug paraphernalia, ended up searching the vehicle, found 10 destructive devices." Schaub was "interviewed initially right on the spot, and he admitted that they were his and in his possession." Schaub was initially held on local charges and, due to a communication error, was released from custody before the federal arrest warrant was issued.

**2.** Agent Raponi testified that Schaub had contacted a relative in Cheyenne.

ty reasons," the officers wanted to attempt to arrest Schaub "away from the building as far as [they] could possibly get him." The officers converged on the body shop and proceeded to "move in and try to apprehend [Schaub] in the parking lot near the vehicle." As the officers approached the scene, Officer Kailey and another officer drew their weapons on the appellant, who was "entering the driver's side of the pickup,"[3] while ATF agents drew their weapons on Schaub, who was "entering the passenger door of the pickup." According to Agent Raponi, Schaub was next to the passenger side of the vehicle and was "in the process of getting in the vehicle at the time he was arrested." The officer believed that the vehicle's passenger door was open.[4]

[¶ 6] All three individuals were ordered to the ground. Schaub and the appellant were handcuffed (the appellant was handcuffed for "officer safety"), and Schaub's cousin was segregated further back from the vehicle but apparently was not handcuffed. At some point, the officers performed a "pat down" to determine whether any of the three individuals possessed a weapon. The appellant stated that, while he was handcuffed and lying on the ground, an officer asked whether he "had any weapons," to which he replied that he had "a belt knife and a pocket knife in my pocket." Schaub's cousin said that he saw the officers subsequently remove a knife from the appellant's pocket.

[¶ 7] Schaub was placed in a police vehicle, and with one possible exception, the officers stowed their weapons.[5] According to Officer Kailey, the appellant was asked about his association with Schaub and an ATF agent explained "what was happening and asked [the appellant] if there were any weapons or contraband inside the vehicle that [the officers] needed to know about. . . ." According to the appellant, the officer asked: "Are there any weapons in your vehicle?" The appellant replied that he had a gun and a clip "between the two front bucket seats of the truck, and that it would be in that place where [the officer] would find it."[6] At this point in time, the appellant (now on his feet) remained handcuffed, was not free to leave the scene (but was not under "arrest," according to Officer Kailey), and had not received a *Miranda* advisement. According to Officer Kailey, an ATF agent then asked the appellant "if he would give consent for us to enter the truck and retrieve that weapon" and the appellant "said that he would consent to us entering the vehicle." The appellant denied that he told the officers that they could enter his vehicle.

[¶ 8] Officer Kailey entered the vehicle to retrieve the firearm. He observed two large leather gloves in between the front bucket seats and, upon removing one glove, Officer Kailey saw the grip of a handgun and a "bag of marijuana" within two inches of the handgun "in plain view." The officer secured the firearm (ensuring that it "was unloaded and safe") and removed the bag of marijuana. He then expanded his search for additional controlled substances and found another bag of marijuana "stuffed inside" one of the leather gloves.

[¶ 9] The appellant was arrested and received a *Miranda* advisement. Thereafter, the appellant told the officers that the marijuana was for "personal use only," but later stated that he had transported the marijuana from Nebraska with the intent to "sell it or

---

3. Officer Kailey testified that the appellant was standing "right at the vehicle with the driver's door open." The appellant denied that he opened the driver's door of the vehicle. Schaub's cousin claimed that the appellant was approximately ten feet from the vehicle when the officers initiated the stop and that the appellant had not opened the driver's door. The body shop owner also stated that the appellant was fourteen feet from the vehicle when the appellant was placed on the ground during the incident, that the appellant never actually reached the pickup, and an officer "with the federal government" opened the driver's door.

4. According to the body shop owner, Schaub was "[r]ight next to the vehicle" and was opening the passenger door when officers arrived at the scene.

5. The appellant stated that one officer still had her shotgun "out," but that to the best of his knowledge, the other officers had holstered their firearms.

6. According to the appellant, the officer also asked whether the gun was loaded, and the appellant replied that it was not.

use it" and that he "often buys ... more marijuana than he would use, and [used] the proceeds from the sale of marijuana to support his habit." The officers ultimately released Schaub's cousin.

[¶ 10] The appellant was charged with possession of marijuana with intent to deliver, a felony, in violation of Wyo. Stat. Ann. § 35–7–1031(a)(ii) (LexisNexis 2003). The appellant filed a motion to suppress his statements to law enforcement and the items seized from his vehicle. Following an evidentiary hearing, the district court denied the appellant's suppression motion. In doing so, the district court found, in pertinent part, that: (1) Schaub was "probably or potentially armed" and was "dangerous;" (2) the officers had "reason to believe that [the appellant] was in [Schaub's] company for some time" prior to April 5, 2002; (3) the location of the arrest was a "busy commercial area" and the officers' reasoning in wanting to attempt the arrest as far away from the building as possible was "entirely sound;" (4) Schaub and the appellant were "at least" about to enter the appellant's vehicle when the officers initiated contact with them and the appellant was "near the vehicle with the opened door;" and (5) the appellant, while handcuffed, was asked "if there was a weapon in the vehicle." The district court concluded, alternatively, that the appellant consented to the officers retrieving the firearm from the appellant's vehicle, that the search was valid pursuant to exigent circumstances to secure the scene "for both officer and public safety," and that the search was a valid search incident to Schaub's lawful arrest.

[¶ 11] The appellant later conditionally pled guilty to the charged offense, preserving his right to appeal the district court's denial of his suppression motion. The district court sentenced the appellant to imprisonment for four to six years, suspended that sentence, and placed the appellant on supervised probation for four years. The appellant now appeals from that judgment and sentence, claiming that the district court erred in denying his suppression motion.

## STANDARD OF REVIEW

[¶ 12] Our standard of review is as follows:

Findings on factual issues made by the district court considering a motion to suppress are not disturbed on appeal unless they are clearly erroneous. *Wilson v. State*, 874 P.2d 215, 218 (Wyo.1994). Since the district court conducts the hearing on the motion to suppress and has the opportunity to assess the credibility of the witnesses, weigh the evidence, and make the necessary inferences, deductions, and conclusions, evidence is viewed in the light most favorable to the district court's determination. *Id.* The issue of law, whether an unreasonable search or seizure has occurred in violation of constitutional rights, is reviewed de novo. *Id.; Brown v. State*, 944 P.2d 1168, 1170–71 (Wyo.1997).

*McChesney v. State*, 988 P.2d 1071, 1074 (Wyo.1999). The appellant does not contend that any particular factual finding by the district court was erroneous. "On those issues where the district court has not made specific findings of fact, this Court will uphold the general ruling of the court below if supported by any reasonable view of the evidence." *State v. Williams*, 2004 WY 53, ¶ 12, 90 P.3d 85, 88 (Wyo.2004).

## DISCUSSION

[¶ 13] The appellant argues that the district court erred in denying his motion to suppress evidence. The premise of the appellant's appellate argument is that, under the circumstances, the law enforcement officers should have advised him in accordance with *Miranda* prior to asking him whether there were "weapons or contraband" inside the vehicle.[7] The appellant does not offer an independent state constitutional analysis; ac-

---

7. In his appellate brief, the appellant also summarily claims that his statements were involuntary under the circumstances. The appellant's analysis on this issue consists of a citation to the applicable legal standard and his one-sentence declaration that the statements were involuntary because he had been "put or ordered to the ground, handcuffed, had a multiplicity of firearms pointed at him, and was immediately questioned...." We do not consider this to be cogent argument and it does not appear that the appellant raised this issue in the district court.

cordingly, our discussion is limited to federal constitutional principles.

[¶ 14] The United States Supreme Court has stated the following with respect to *Miranda:*

> The Fifth Amendment guarantees that "[n]o person ... shall be compelled in any criminal case to be a witness against himself." In *Miranda* this Court for the first time extended the Fifth Amendment privilege against compulsory self-incrimination to individuals subjected to custodial interrogation by the police. 384 U.S., at 460–61, 467, 86 S.Ct., at 1620–21, 1624. The Fifth Amendment itself does not prohibit all incriminating admissions; "[a]bsent some officially *coerced* self-accusation, the Fifth Amendment privilege is not violated by even the most damning admissions." *United States v. Washington,* 431 U.S. 181, 187, 97 S.Ct. 1814, 1818, 52 L.Ed.2d 238 (1977) (emphasis added). The *Miranda* Court, however, presumed that interrogation in certain custodial circumstances is inherently coercive and held that statements made under those circumstances are inadmissible unless the suspect is specifically informed of his *Miranda* rights and freely decides to forgo those rights. The prophylactic *Miranda* warnings therefore are "not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker,* 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974); see *Edwards v. Arizona,* 451 U.S. 477, 492, 101 S.Ct. 1880, 1888, 68 L.Ed.2d 378 (1981) (POWELL, J., concurring). Requiring *Miranda* warnings before custodial interrogation provides "practical reinforcement" for the Fifth Amendment right. *Michigan v. Tucker, supra,* 417 U.S., at 444, 94 S.Ct., at 2364.

*New York v. Quarles,* 467 U.S. 649, 654, 104 S.Ct. 2626, 2630, 81 L.Ed.2d 550 (1984) (footnote omitted).

[¶ 15] Even if we were to assume for purposes of this appeal that the *Miranda* rule applied to the instant case, we note that the United States Supreme Court has recognized an exception to that rule. In *Quarles,*

467 U.S. at 651–52, 104 S.Ct. 2626, a young woman informed officers that "she had just been raped by a black male," provided the officers a description of the individual, and stated that he had just entered a nearby supermarket while carrying a gun. After spotting a man in the supermarket who matched the description provided by the young woman, Officer Frank Kraft drew his gun and pursued the man, ordering the man to stop and put his hands over his head. *Id.* at 652, 104 S.Ct. 2626.

> Although more than three officers had arrived on the scene by that time, Officer Kraft was the first to reach respondent. He frisked him and discovered that he was wearing a shoulder holster which was then empty. After handcuffing him, Officer Kraft asked him where the gun was. Respondent nodded in the direction of some empty cartons and responded, "the gun is over there." Officer Kraft thereafter retrieved a loaded .38–caliber revolver from one of the cartons, formally placed respondent under arrest, and read him his *Miranda* rights from a printed card. Respondent indicated that he would be willing to answer questions without an attorney present. Officer Kraft then asked respondent if he owned the gun and where he had purchased it. Respondent answered that he did own it and that he had purchased it in Miami, Fla.

*Id.* The United States Supreme Court further noted that Quarles was handcuffed and surrounded by at least four police officers, which officers were no longer concerned for their own physical safety, when the questioning at issue occurred. *Id.* at 655, 104 S.Ct. 2626.

[¶ 16] The United States Supreme Court's analysis follows:

> We hold that on these facts there is a "public safety" exception to the requirement that *Miranda* warnings be given before a suspect's answers may be admitted into evidence, and that the availability of that exception does not depend upon the motivation of the individual officers involved. In a kaleidoscopic situation such as the one confronting these officers, where spontaneity rather than adherence

to a police manual is necessarily the order of the day, the application of the exception which we recognize today should not be made to depend on *post hoc* findings at a suppression hearing concerning the subjective motivation of the arresting officer. Undoubtedly most police officers, if placed in Officer Kraft's position, would act out of a host of different, instinctive, and largely unverifiable motives—their own safety, the safety of others, and perhaps as well the desire to obtain incriminating evidence from the suspect.

Whatever the motivation of individual officers in such a situation, we do not believe that the doctrinal underpinnings of *Miranda* require that it be applied in all its rigor to a situation in which police officers ask questions reasonably prompted by a concern for the public safety. The *Miranda* decision was based in large part on this Court's view that the warnings which it required police to give to suspects in custody would reduce the likelihood that the suspects would fall victim to constitutionally impermissible practices of police interrogation in the presumptively coercive environment of the station house. [*Miranda*] 384 U.S., at 455–458, 86 S.Ct., at 1617–1619. The dissenters warned that the requirement of *Miranda* warnings would have the effect of decreasing the number of suspects who respond to police questioning. *Id.*, at 504, 516–517, 86 S.Ct., at 1643, 1649–1650 (Harlan, J., joined by Stewart and WHITE, JJ., dissenting). The *Miranda* majority, however, apparently felt that whatever the cost to society in terms of fewer convictions of guilty suspects, that cost would simply have to be borne in the interest of enlarged protection for the Fifth Amendment privilege.

The police in this case, in the very act of apprehending a suspect, were confronted with the immediate necessity of ascertaining the whereabouts of a gun which they had every reason to believe the suspect had just removed from his empty holster and discarded in the supermarket. So long as the gun was concealed somewhere in the supermarket, with its actual whereabouts unknown, it obviously posed more than one danger to the public safety: an accomplice might make use of it, a customer or employee might later come upon it.

In such a situation, if the police are required to recite the familiar *Miranda* warnings before asking the whereabouts of the gun, suspects in Quarles' position might well be deterred from responding. Procedural safeguards which deter a suspect from responding were deemed acceptable in *Miranda* in order to protect the Fifth Amendment privilege; when the primary social cost of those added protections is the possibility of fewer convictions, the *Miranda* majority was willing to bear that cost. Here, had *Miranda* warnings deterred Quarles from responding to Officer Kraft's question about the whereabouts of the gun, the cost would have been something more than merely the failure to obtain evidence useful in convicting Quarles. Officer Kraft needed an answer to his question not simply to make his case against Quarles but to insure that further danger to the public did not result from the concealment of the gun in a public area.

We conclude that the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination. We decline to place officers such as Officer Kraft in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them.

In recognizing a narrow exception to the *Miranda* rule in this case, we acknowledge that to some degree we lessen the desirable clarity of that rule. At least in part in order to preserve its clarity, we have over the years refused to sanction attempts to expand our *Miranda* holding.... As we have in other contexts, we recognize here

the importance of a workable rule "to guide police officers, who have only limited time and expertise to reflect on and balance the social and individual interests involved in the specific circumstances they confront." *Dunaway v. New York*, 442 U.S. 200, 213–214, 99 S.Ct. 2248, 2257, 60 L.Ed.2d 824 (1979). But as we have pointed out, we believe that the exception which we recognize today lessens the necessity of that on-the-scene balancing process. The exception will not be difficult for police officers to apply because in each case it will be circumscribed by the exigency which justifies it. We think police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect.

The facts of this case clearly demonstrate that distinction and an officer's ability to recognize it. Officer Kraft asked only the question necessary to locate the missing gun before advising respondent of his rights. It was only after securing the loaded revolver and giving the warnings that he continued with investigatory questions about the ownership and place of purchase of the gun. The exception which we recognize today, far from complicating the thought processes and the on-the-scene judgments of police officers, will simply free them to follow their legitimate instincts when confronting situations presenting a danger to the public safety.

We hold that the Court of Appeals in this case erred in excluding the statement, "the gun is over there," and the gun because of the officer's failure to read respondent his *Miranda* rights before attempting to locate the weapon. Accordingly we hold that it also erred in excluding the subsequent statements as illegal fruits of a *Miranda* violation.

*Quarles*, 467 U.S. at 654–59, 104 S.Ct. 2626 (footnotes omitted). *See also United States v. Padilla*, 819 F.2d 952, 960–61 (10th Cir. 1987) and *Dice v. State*, 825 P.2d 379, 386–87 (Wyo.1992). This exception "extends beyond safety to civilians. The exception undoubtedly extends to officers' 'questions necessary to secure their own safety.' [*Quarles*, 467 U.S.]

at 659, 104 S.Ct. 2626; *cf. United States v. Holt*, 264 F.3d 1215, 1221–26 (10th Cir.2001) (en banc) (concerns about officer safety justify routinely asking about presence of weapons during traffic stop)." *United States v. Lackey*, 334 F.3d 1224, 1228 (10th Cir.), *cert. denied*, —— U.S. ——, 124 S.Ct. 502, 157 L.Ed.2d 399 (2003).

[¶ 17] We find the United States Supreme Court's reasoning in *Quarles* to be particularly persuasive in the instant case. *See United States v. Brady*, 819 F.2d 884, 888 (9th Cir.1987), *cert. denied*, 484 U.S. 1068, 108 S.Ct. 1032, 98 L.Ed.2d 996 (1988) (applying *Quarles* despite factual differences). In the instant case:

1. Schaub was the subject of a felony arrest warrant for possessing ten pipe bombs, drugs, and drug paraphernalia, and was a suspect or relevant witness in the attempted murder of a prosecutor. Accordingly, the officers considered Schaub to be very dangerous, possibly armed, and apparently had information that Schaub had a violent history.

2. The officers were informed that the appellant had been with Schaub for "quite some time" leading up to Schaub's arrest, and knew that Schaub had also contacted a relative in Cheyenne.

3. The officers thought Schaub was at a body shop in a busy commercial area around 5:00 p.m. The owner of the body shop was able to observe and hear the incident from the body shop's office and there were "other people that were inside the office at the time. . . ."

4. The appellant's vehicle was parked in the body shop's parking lot, within sixty to one hundred feet of the business. While the officers were watching the body shop, a male subject (not Schaub) entered the vehicle's driver's door, retrieved something, and returned to the body shop.

5. Three male subjects, including Schaub, exited the body shop and approached the appellant's vehicle. For safety reasons, the officers wanted to arrest Schaub as far from the business as possible. By the time the officers reached the scene, it is undisputed

that Schaub was entering the vehicle's passenger door. The district court found that the appellant was, at the very least, about to enter the vehicle and the appellant was near the vehicle with the opened door. According to Officer Kailey, the appellant was standing at the vehicle with the driver's door open.

6. The officers arrested Schaub. While he was placed in a police vehicle, the record does not indicate that Schaub was otherwise removed from the scene. The officers simultaneously ordered the appellant and the third individual to the ground and handcuffed the appellant for officer safety. Schaub's cousin was segregated further back from the vehicle but apparently was not handcuffed. The officers conducted a "pat down" of the individuals to determine whether they possessed any weapons. According to the appellant, an officer also asked the appellant whether he had "any weapons...." The appellant informed the officer that he had a belt knife and a pocketknife in his pocket, and the officers apparently removed those items from the appellant's person. The appellant does not question the officers' actions to this point in the encounter.

7. An officer "explained what was happening" and asked the appellant, now on his feet but still handcuffed, about his association with Schaub.[8] Having apparently removed two knives from the appellant's person, an officer also asked the appellant if there "was a weapon in the vehicle" or whether there "were any weapons or contraband inside the vehicle that [the officers] needed to know about...." The appellant informed the officer that he had a particular handgun and a clip between the vehicle's two front bucket seats. An officer then went to that precise location to retrieve the firearm, where he found the firearm and a bag of marijuana. Aside from the claimed *Miranda* violation, the appellant does not assert that the officer acted improperly in retrieving the firearm from the vehicle or thereafter.

[¶ 18] We therefore conclude that the officer's question as to the presence of weapons in the appellant's vehicle was related to an objectively reasonable need to secure the officers' safety and/or the public's safety.[9] *See generally, for example, United States v. Newton,* 369 F.3d 659, 677–79 (2nd Cir.2004); *United States v. DeSantis,* 870 F.2d 536, 538–39 (9th Cir.1989); *Brady,* 819 F.2d at 887–89; and *State v. McKessor,* 246 Kan. 1, 785 P.2d 1332, 1336–37, *cert. denied,* 495 U.S. 937, 110 S.Ct. 2184, 109 L.Ed.2d 513 (1990).

[¶ 19] Neither the fact that Schaub presumably remained handcuffed in the police vehicle at the scene nor the fact that the appellant remained handcuffed when he was asked the question at issue necessarily diminish the immediacy of the exigencies at hand,[10] particularly once the officers had discovered two knives on the appellant's person. Considerations similar to those posed by the instant case have often been articulated in the context of a Fourth Amendment analysis. For example, in *Fender v. State,* 2003 WY 96, ¶ 19 n. 5, 74 P.3d 1220, 1229 n. 5 (Wyo.2003) *(quoting United States v. Sanders,* 994 F.2d

---

8. The record does not indicate precisely what the appellant was asked, or what, if any, response was given by the appellant. On appeal, the appellant merely declares that this "constituted interrogation" in the context of whether *Miranda* was applicable to the instant case. Given the state of the record, and the context in which the issue was addressed by the appellant, we do not place much significance on the issue in analyzing the applicability of the public safety exception to the *Miranda* rule. The nature of the subject appears to relate directly to the officer's effort to secure the scene and defuse the perceived danger, as opposed to some investigatory purpose. In addition, the focus of the appellant's appellate argument clearly is the officer's question as to whether "there were any weapons or contraband inside the vehicle...."

9. In distinguishing *Quarles* from *Orozco v. Texas,* 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), a case in which it found the officers' questions about a gun to be investigatory, the Court stated that the questions in *Orozco* "did not in any way relate to an objectively reasonable need to protect the police or the public from any immediate danger associated with the weapon. In short there was no exigency requiring immediate action by the officers beyond the normal need expeditiously to solve a serious crime." *Quarles,* 467 U.S. at 659 n. 8, 104 S.Ct. 2626.

10. The appellant does not question the officers' justification, under the circumstances, for detaining the appellant at the scene, the means used to restrain the appellant, or the officers' actions leading up to the question at issue.

200, 209 (5th Cir.), *cert. denied,* 510 U.S. 955, 114 S.Ct. 408, 126 L.Ed.2d 355, *cert. denied,* 510 U.S. 1014, 114 S.Ct. 608, 126 L.Ed.2d 572 (1993)), we noted the following with respect to the use of handcuffs:

> "[The] argument is entirely dependent on the assumption that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will flee or do them harm. As is sadly borne out in the statistics for police officers killed and assaulted in the line of duty each year, however, this assumption has no basis in fact.
>
> Handcuffs are a temporary restraining device; they limit but do not eliminate a person's ability to perform various acts. They obviously do not impair a person's ability to use his legs and feet, whether to walk, run, or kick. Handcuffs do limit a person's ability to use his hands and arms, but the degree of the effectiveness of handcuffs in this role depends on a variety of factors, including the handcuffed person's size, strength, bone and joint structure, flexibility, and tolerance of pain. Albeit difficult, it is by no means impossible for a handcuffed person to obtain and use a weapon concealed on his person or within lunge reach, and in so doing to cause injury to his intended victim, to a bystander, or even to himself. Finally, like any mechanical device, handcuffs can and do fail on occasion."

[¶ 20] In *Michigan v. Long,* 463 U.S. 1032, 1051–52, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (emphasis in original), the United States Supreme Court stated:

> The Michigan Supreme Court appeared to believe that it was not reasonable for the officers to fear that Long could injure them, because he was effectively under their control during the investigative stop and could not get access to any weapons that might have been located in the automobile.... This reasoning is mistaken in several respects. During any investigative detention, the suspect is "in the control" of the officers in the sense that he "may be briefly detained against his will...." *Terry [v. Ohio,* 392 U.S. 1], at 34, 88 S.Ct., [1868] at 1886 [20 L.Ed.2d 889 (1968) ] (WHITE, J., concurring). Just as a *Terry* suspect on the street may, despite being under the brief control of a police officer, reach into his clothing and retrieve a weapon, so might a *Terry* suspect in Long's position break away from police control and retrieve a weapon from his automobile.... In addition, if the suspect is not placed under arrest, he will be permitted to reenter his automobile, and he will then have access to any weapons inside.... Or, as here, the suspect may be permitted to reenter the vehicle before the *Terry* investigation is over, and again, may have access to weapons. In any event, we stress that a *Terry* investigation, such as the one that occurred here, involves a police investigation "at close range," *Terry,* 392 U.S., at 24 [88 S.Ct. 1868], when the officer remains particularly vulnerable in part *because* a full custodial arrest has not been effected, and the officer must make a "quick decision as to how to protect himself and others from possible danger...." *Id.,* at 28 [88 S.Ct. 1868].

[¶ 21] Similarly, in *United States v. Palmer,* 360 F.3d 1243, 1247–48 (10th Cir. 2004), a case involving a dangerous suspect detained in a patrol car by one officer while another officer searched the locked glove box in the suspect's vehicle for weapons, the Tenth Circuit Court of Appeals stated:

> If Defendant had broken away from the officers, obtaining a gun from inside the glove box would have taken only a moment more than obtaining a gun from anywhere else within the passenger compartment. To be sure, the tasks of getting a key and unlocking the glove box would delay Defendant somewhat; but a suspect who is able to break free of officers detaining him could also seize the keys, and the suspect may have another means of entry to the glove box, such as a key that would not be detected during a proper frisk or a weapons search of the vehicle. Furthermore, Defendant would have access to the gun at the conclusion of the encounter, assuming that he was only issued a citation and not arrested.
>
> ...

... Moreover, as noted in *Long*, Defendant would certainly have had access to the gun after the citation was issued and he was released to go.

[¶ 22] Regarding the form of the question at issue in this case, the appellant emphasizes the officer's use of the word "contraband" in questioning the appellant at the scene. The district court found that the officer asked the appellant "if there was a weapon in the vehicle," which finding is consistent with the appellant's testimony that the officer asked him about the presence of "weapons" in the vehicle. Nevertheless, the possibility (according to Officer Kailey's testimony) that the officer asked the appellant about the presence of "weapons or contraband" in the vehicle does not necessarily transform the officer's question into an "investigatory" question. The officer's subjective motivation in posing the question is not part of the analysis. *Quarles*, 467 U.S. at 656, 104 S.Ct. 2626. Objectively, then, the officers had a reasonable basis to be concerned for their safety, and the public's safety, pursuant to the aforementioned circumstances. An officer specifically asked the appellant about the presence of "weapons or contraband," the appellant answered the question specifically as to where the officer could find a particular weapon in the vehicle, and the officer went to retrieve the weapon in the precise location identified by the appellant. Once the appellant was formally arrested due to the bag of marijuana that was also found in that location, an officer *Mirandized* the appellant and then began to ask the appellant investigatory questions about the marijuana.[11]

[¶ 23] We note that in *Newton*, 369 F.3d at 663, the officer asked a handcuffed suspect whether he had any "contraband" in the house. The suspect replied "only what is in the box," and when asked what was in the box, further replied "a two and two." *Id.* at 664. The officer found a .22 caliber handgun, a loaded magazine, and some ammunition in the box. "To be sure, the public safety exception does not permit officers to pose

'questions designed solely to elicit testimonial evidence from a suspect.' *New York v. Quarles*, 467 U.S. at 658–59, 104 S.Ct. 2626 (emphasis added). Thus, to fall within the exception, a question must have some rational relationship to defusing the perceived danger." *Newton*, 369 F.3d at 679 n. 8. The Second Circuit Court of Appeals reasoned:

The same logic applies to this case. Although [the officer's] inquiry about "contraband" did not specifically refer to firearms, the term plainly encompassed such items. Indeed, [the suspect's] response indicates that he so understood the question. That the term "contraband" could also include items not presenting immediate public safety concerns does not defeat the *Miranda* exception in this case.

*Id.* at 679.

[¶ 24] For comparison purposes, we further note that the officer's question in the instant case was much more specific as to the presence of weapons than the question at issue in *United States v. Williams*, 181 F.3d 945 (8th Cir.1999). In *Williams*, 181 F.3d at 948, the defendant was located in his bedroom and handcuffed. An officer asked the defendant, without a *Miranda* warning, " '[i]s there anything we need to be aware of?,' " and the defendant replied that there was a gun in the bedroom closet. *Id.* The Eighth Circuit Court of Appeals analyzed the question at issue as follows:

While the officer did not specifically refer to weapons or safety concerns in the question posed to Williams, the question sought information related to weapons or other safety concerns. The fact that the question was also broad enough to elicit other information does not prevent application of the public safety exception when safety was at issue. Moreover, we believe that conditioning admissibility of evidence under the public safety exception on an officer's ability to ask questions in a specific form would run counter to the *Quarles* Court's decision that an officer may forego announcement of *Miranda* warnings when public safety is threatened. The *Quarles*

11. *Quarles*, 467 U.S. at 652, 104 S.Ct. 2626; *see also State v. Caldwell*, 639 N.W.2d 64, 68 (Minn. App.2002) (noting that the officer "did not continue with investigatory questions until after he gave the *Miranda* warning to appellant").

Court believed that the value of the *Miranda* warning was outweighed by safety concerns in situations "where spontaneity rather than adherence to a police manual is necessarily the order of the day." *Quarles,* 467 U.S. at 656, 104 S.Ct. 2626. Under the circumstances of this case, the concerns for the safety of the officers required a spontaneous inquiry by the officer.

*Williams,* 181 F.3d at 953–54 n. 13.

[¶ 25]   Accordingly, we affirm the denial of the appellant's suppression motion.