2006 WY 20

**Timothy Paul MARTINEZ,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 04–238.

Supreme Court of Wyoming.

Feb. 13, 2006.

Kenneth M. Koski, State Public Defender; Donna D. Domonkos, Appellate Counsel; and Megan Hayes, Special Assistant Public Defender, for Appellant.

Patrick J. Crank, Wyoming Attorney General; Paul S. Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; and James Michael Causey, Assistant Attorney General, for Appellee.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

VOIGT, Justice.

[¶ 1]   In May 2004, a Natrona County jury found Timothy Paul Martinez (the appellant) guilty of first-degree murder for brutally beating his wife to death with a shotgun.  On appeal, the appellant claims that the State violated his constitutional rights because he lost material and favorable trial testimony when law enforcement officers threatened or coerced a potential defense witness, that his trial attorneys were ineffective, that his sentence was unconstitutional, and that his sentence was based on inaccurate information. We affirm.

## ISSUES

[¶ 2]   1.  Whether the State violated the appellant's constitutional rights by threatening or coercing a potential defense witness?

2.  Whether the appellant's trial counsel were ineffective?

3.  Whether the constitutionality of the appellant's sentence was raised properly in the district court?

4.  Whether the appellant was sentenced based on inaccurate information?

## FACTS

[¶ 3]   It is not necessary for us to set forth the evidentiary facts in great detail due to the nature of the issues raised in this appeal.  Melissa Martinez (the victim) and the appellant were married in 1999, and they had two children (ages two and four at the time of the victim's death).  By September 2003, the victim had decided to leave their residence in Casper and move herself and the children back to her parents' residence in Sinclair, Wyoming.  To that end, the victim gathered her possessions, sold some of the possessions at a yard sale, and rented a U-haul truck the weekend of September 7. She also arranged for her parents to meet her at 11 a.m. that Sunday to load the U-haul and then caravan back to Sinclair.

[¶ 4] When the victim's family arrived at her residence on Sunday, they encountered the appellant and the children but were unable to locate the victim. Law enforcement officers subsequently discovered the victim's body in a duffel bag in the residence's laundry room, as well as a shotgun that had been placed in the rafters above the laundry room. The coroner opined that the shotgun had been used to beat the victim about the head—the victim sustained at least ten blows to the head, including one blow that caused a six-inch skull fracture.

[¶ 5] The appellant was charged with first-degree murder in violation of Wyo. Stat. Ann. § 6–2–101(a) (LexisNexis 2003). He testified in his own defense at trial and essentially implicated another individual, Randy Anderson, in the killing. Anderson testified that he had nothing to do with the victim's murder. The jury found the appellant guilty of first-degree murder following an eight-day trial, and the district court sentenced the appellant to life imprisonment without the possibility of parole. The appellant now appeals from the district court's judgment and sentence.

## DISCUSSION

### *Compulsory Process*

[¶ 6] The appellant argues that the State intentionally caused the loss of material and favorable trial testimony because law enforcement officers threatened or coerced a potential defense witness, thereby interfering with the witness' "free and unhampered choice to testify" at the appellant's

trial. According to the appellant, this conduct impaired his ability to present his own witnesses and establish a defense, which violated his constitutional rights to due process and compulsory process.[1] We generally review a claim "that a constitutional right has been violated by applying our *de novo* standard of review." *Pope v. State*, 2002 WY 9, ¶ 14, 38 P.3d 1069, 1072 (Wyo.2002); *see also United States v. Serrano*, 406 F.3d 1208, 1214 (10th Cir.2005), *cert. denied*, —— U.S. ——, 126 S.Ct. 277, 163 L.Ed.2d 247 (2005).

[¶ 7] The pertinent facts are undisputed. On April 14, 2004, the appellant filed a list of "potential" trial witnesses, which list included James Friedman (Friedman). At the district attorney's request, two Casper police detectives interviewed Friedman the next day at the Natrona County Detention Center. The detectives advised Friedman of his *Miranda* rights and Friedman proceeded to tell the officers about his conversation with Randy Anderson (Anderson) in January 2004. Anderson "boast[ed]" to Friedman that he was a "collector"—if "somebody needed something done, he was the guy to go to." Anderson claimed that he and the appellant were using methamphetamine the night the victim was murdered, and the appellant sent Anderson to retrieve some stereo speakers from the basement of the appellant's residence. When he encountered the victim at the residence, the victim told Anderson that he needed to leave. Anderson refused to leave and the victim produced a shotgun, which "was jammed." Anderson ultimately took the shotgun from the victim and struck her twice in the face. The appellant arrived at the residence about fifteen minutes later

---

1. The Sixth Amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor...." The Fourteenth Amendment to the United States Constitution provides, in pertinent part: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law...."

The appellant also argues that his rights pursuant to the Wyoming Constitution were violated. *See* Wyo. Const. art. 1, § 10. However, the appellant merely notes that we are " 'free to grant more rights to our citizens under the Wyoming

Constitution than they are entitled to have under the United States Constitution' " and asks that we "hold that his constitutional rights to due process and compulsory process under the Wyoming Constitution were violated by the actions of the government in depriving [the appellant] of important exculpatory evidence." To the extent that the appellant asks us independently to interpret the Wyoming Constitution, this analysis does not constitute the " 'precise, analytically sound approach [required] when advancing an argument' " to do so. *Vassar v. State*, 2004 WY 125, ¶ 14, 99 P.3d 987, 993 (Wyo.2004) (*quoting Vasquez v. State*, 990 P.2d 476, 484 (Wyo.1999)). We will therefore analyze this issue according to federal constitutional authority.

and saw that Anderson was covered with blood.

[¶ 8] Upon reviewing an audiotape of the interview, detective Robin Tuma (Tuma) asked Friedman if he would "be willing to take a polygraph test to show that the information he had given ... was true."[2] Friedman agreed, and Tuma scheduled the examination for the next morning with detective Tim Weinhandl (Weinhandl). On April 16, Friedman was transported from the detention center to an interview room, where Tuma removed Friedman's restraints. Weinhandl followed his typical examination procedure and first obtained background and biographical information from Friedman. During this portion of the examination (which was not recorded), Friedman mentioned that he "was in jail awaiting a [presentence] investigation" in a different case. Weinhandl had no knowledge of this "underlying case" prior to the polygraph examination. Weinhandl then, as was his practice, informed Friedman of his *Miranda* rights and Friedman ultimately signed a form[3] waiving those rights as well as a "release of liability form."

[¶ 9] Friedman asked Weinhandl what effect the polygraph "would have on him."[4] At first, Weinhandl thought Friedman was worried about being shocked by the polygraph machine. When Friedman clarified that he was actually worried "about the statement he was going to give," Weinhandl replied that the appellant's case was an "ongoing criminal investigation," that Weinhandl's purpose was "to determine whether or not the information [Friedman] provided us with was the truth," and that if Friedman's information "was false in any way, that there are possible charges that could be filed against him" which also could "possibl[y]" affect his pending presentence investigation. Weinhandl denied that he threatened to prosecute Friedman "if he lied." Rather, he

told Friedman that he "wanted the truth in this matter and if the statement that he had already given [was] the truth, fine." The detective then asked Friedman if his first statement to the detectives was the truth, and Friedman said that it "was not"—the source of the information he provided in his first interview was not Anderson, but was instead the appellant (whom Friedman had known since 2001) and another jail inmate.

[¶ 10] Weinhandl conferred with Tuma, and they called the district attorney. According to Weinhandl, the district attorney instructed them to tell Friedman "that ... changing ... his statement at this time is not going to affect the deal that he has going on right now" and that whatever Friedman said, "we just wanted the truth"—it "didn't matter if he changed [his statement] or not." According to Tuma, the district attorney instructed them to ensure that Friedman understood that "even though he lied previously, it wouldn't affect his deal, and he just needed to tell the truth"—Friedman's "deal was not impaired in any way no matter what he said." The detectives conveyed this information to Friedman. Tuma also reiterated to Friedman at some point that "by telling us the truth now and lying prior, that had not affected what he had worked out with his attorney and the district attorney," and Tuma denied that he indicated that Friedman "should or should not testify in any particular manner."

[¶ 11] Since Friedman had stated that his first taped statement was partially untrue, Weinhandl told Friedman that the detectives wanted him to provide them another taped statement and Friedman indicated "that would be fine." Friedman was again advised of his *Miranda* rights and he apparently signed a form waiving those rights. He stated during the taped interview that he had not told the truth to the appellant's investigator or to Tuma the previous day regarding the

---

**2.** Friedman was the only individual that Tuma attempted to polygraph in this case.

**3.** The document informs the subject of his "right to remain silent," to "talk to an Attorney before we ask you any questions, and to have him with you during questioning," and to "stop answering questions at any time during this interview."

**4.** Tuma was observing the examination through a two-way mirror and confirmed that Friedman, not Weinhandl, initiated the conversation regarding Friedman's other pending case.

source of his information about Anderson's alleged role in the victim's murder—the source was not Anderson himself, but was instead the appellant [5] and another inmate. This statement was more detailed than Friedman's statement the previous day and differed in some other respects that are not material to this appeal. During the statement, Weinhandl also confirmed what he had previously discussed with Friedman regarding Friedman's pending presentence investigation:

[Weinhandl:] And we talked about a previous [incident] that you're already in jail for that you [inaudible] a PSI for?

[Friedman:] Yes, sir.

[Weinhandl:] And you have some time hanging over your head for that, correct?

[Friedman:] Yes, sir.

[Weinhandl:] And I informed you that, uh, that interfering in a criminal investigation could result in some other criminal charges . . .

[Friedman:] Yes, sir.

[Weinhandl:] . . . which could also affect your PSI that's going on right now?

[Friedman:] Yes, sir.

[Weinhandl:] And I then asked you to tell me the truth about this?

[Friedman:] Yes, sir.

[Weinhandl:] Whether it's the statement you gave before or something different?

[Friedman:] Yes, sir.

Friedman also acknowledged on tape that he had not been threatened or promised anything, and no one "threatened to throw [him] in jail or do anything like that or screw up any deals" that he already had in place. The

detectives ended the interview and returned Friedman to the detention center without completing the polygraph examination.[6]

[¶ 12] On April 26, 2004 (the third day of the appellant's trial), the appellant filed a Motion for Mistrial Based on State's Intimidation of Listed Defense Witness. The district court held a hearing on the motion that morning. The district court ultimately denied the appellant's motion, concluding that Friedman had not yet invoked his right to remain silent with respect to his potential trial testimony [7] and that neither the district attorney, nor any of his agents, had "meaningfully interfered" with the appellant's right to compulsory process.[8] The appellant never called Friedman to testify in support of his motion, or during his trial.[9]

[¶ 13] The United States Supreme Court has said that the

right of an accused to have compulsory process for obtaining witnesses in his favor stands on no lesser footing than the other Sixth Amendment rights that we have previously held applicable to the States. . . . The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

---

**5.** Friedman stated that the appellant did not tell him to fabricate the fact that Anderson told him this information.

**6.** Tuma testified that the polygraph examination was not completed because Friedman "changed his statements and said that the information he gave us [on April 16] was the truth"; the statement the officers intended to polygraph him on "had already changed," but if Friedman "had wanted to take [the examination], then, yes, we could have continued."

**7.** In the event that Friedman did so, the district court indicated that it would conduct an in cam-

era proceeding to determine whether or not Friedman's invocation was "in any way related to the communications he has had with the prosecution in this case."

**8.** The appellant does not appeal the district court's denial of his mistrial motion.

**9.** The appellant's trial counsel indicated during the hearing that "a significant portion of the . . . [appellant's] case has been compromised and whether we can clean it up or clear it up, I don't know."

*Washington v. Texas*, 388 U.S. 14, 18–19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). *See generally also Person v. State*, 2004 WY 149, ¶¶ 13–14, 100 P.3d 1270, 1276–77 (Wyo. 2004); and *Dysthe v. State*, 2003 WY 20, ¶¶ 5–6, 63 P.3d 875, 879 (Wyo.2003).

[¶ 14] The "government cannot substantially interfere with a defense witness's decision to testify." *Serrano*, 406 F.3d at 1215; *see also United States v. Smith*, 997 F.2d 674, 680 (10th Cir.1993), *cert. denied*, 510 U.S. 937, 114 S.Ct. 357, 126 L.Ed.2d 321 (1993). "Interference is substantial when the government actor actively discourages a witness from testifying through threats of prosecution, intimidation, or coercive badgering." *Serrano*, 406 F.3d at 1216. In order to establish a fourteenth amendment due process violation based on the denial of the right to compulsory process, a defendant must establish "more than the mere absence of testimony." *United States v. Valenzuela–Bernal*, 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). There must be a plausible showing that an act by the government caused the loss or erosion of testimony that was both material and favorable to the defense. *Id.; see also United States v. Hoffman*, 832 F.2d 1299 (1st Cir.1987) (construing *Valenzuela–Bernal* to require a nexus between the challenged government conduct and the defendant's inability to present evidence). *Griffin v. Davies*, 929 F.2d 550, 553 (10th Cir.1991), *cert. denied*, 502 U.S. 878, 112 S.Ct. 223, 116 L.Ed.2d 180 (1991). An analysis of these issues "must be conducted on a case-by-case basis." *Serrano*, 406 F.3d at 1216.

[¶ 15] We must first determine what government conduct is at issue in this appeal. It is worth noting that the premise of the appellant's argument is that Friedman's statement to the police on April 15 (the "first statement") was true and that the detectives proceeded to threaten or coerce Friedman such that he changed this statement on April 16 (the detectives, of course, accepting Friedman's representation that his taped statement to them on April 16 (the "second statement") was the "complete truth"). The appellant does not contend that the detectives threatened, coerced, or badgered Friedman during his first statement. That being the case, the only meaningful differences we can discern between the circumstances surrounding Friedman's first statement and those surrounding his second statement are: 1) the setting of the second statement was in connection with a polygraph examination that Tuma requested; and 2) during the initial stages of the polygraph examination, and again after the detectives conferred with the district attorney, Friedman and the detectives discussed what might occur if Friedman lied during the polygraph examination.

[¶ 16] It was not inherently inappropriate for Tuma to ask Friedman whether he would agree to take a polygraph examination in the instant case, and the appellant has not directed us to any contrary legal authority. Tuma did not, based on the record before us, threaten, coerce, or badger Friedman into agreeing to take the polygraph examination. The record only reflects that Tuma, for whatever reason,[10] made a single request regarding Friedman's willingness to take the examination "to show that the information he had given ... was true." Nothing in the record indicates that Tuma knew of Friedman's other pending case prior to making this request, that he mentioned the pending case in making the request, or that he threatened Friedman in the event that Friedman did not agree to take the polygraph examination. Friedman, clearly informed as to the purpose of the examination, simply agreed. He could just as easily have rebuffed Tuma.

[¶ 17] Nor can we say that Friedman was threatened, coerced, or badgered during the initial stages of the polygraph examination. Weinhandl followed his standard procedure in conducting the examination and our review of the record does not reveal the examination to have been unduly coercive. It is undisputed that Weinhandl did not know about Friedman's other pending case prior to the polygraph examination, and that it was Friedman who first mentioned that fact to Weinhandl. Friedman was advised of his *Miranda* rights,

---

**10.** Neither party asked Tuma specifically why he requested the polygraph examination.

signed a written waiver of those rights, and never indicated that he wanted to end the examination or to consult an attorney.[11]

[¶ 18] Friedman did express some concern about what would happen if he lied during the polygraph examination. Our focus, then, shifts to the detectives' response to Friedman's concern. Other courts have considered whether a judge or a prosecutor violated a defendant's constitutional rights by advising a witness of the implications of perjury, which would seem to be analogous to what occurred in the instant case. The benchmark frequently used in measuring conduct of this nature is the United States Supreme Court's opinion in *Webb v. Texas,* 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330 (1972). The following excerpt aptly describes what occurred in that case:

> In *Webb,* the Court ... held that a trial court judge deprived a criminal defendant of his right to compulsory process when the judge threatened a defense witness with prosecution for perjury, which effectively prevented the witness from testifying. At the trial, the defense called only one witness. On his own initiative, the trial judge said to the witness:
>
>> "Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the [likelihood] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is

probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking."

The witness thereafter refused to testify and was excused.

> The trial court's error, the Supreme Court said, was to gratuitously single out this particular witness and admonish him, at an inordinately great length, about the dangers of perjury. Instead of just "warning the witness of his right to refuse to testify and of the necessity to tell the truth," the judge implied that he expected the witness to lie and, in unnecessarily strong terms, threatened the witness with a perjury conviction. These admonishments likely exerted significant duress upon the witness, precluding him from freely and voluntarily choosing whether to testify. Such judicial threats, the Court held, deprived the defendant of his right to due process....

*State v. Stanley,* 351 Md. 733, 720 A.2d 323, 327–28 (1998) (citations omitted).

[¶ 19] However, it has been said that a constitutional violation does not occur in that context "merely by advising a witness of the possibility that he or she could face prosecution for perjury if his or her testimo-

---

11. Interestingly, the appellant appears to suggest that the detectives intimidated Friedman by "repeatedly" informing him of his *Miranda* rights. We note that the detectives advised Friedman of his *Miranda* rights during his first taped statement, which statement the appellant does not claim was coerced. The detectives did not deviate from that practice during the polygraph examination or when Friedman provided his second taped statement. We also note that *Miranda* advisements have been characterized as mea-

sures taken to insure that the right against compulsory self-incrimination is "protected." *See Mackrill v. State,* 2004 WY 129, ¶ 14, 100 P.3d 361, 365 (Wyo.2004). Surely, if the detectives had not advised Friedman of his rights, the appellant would have relied heavily on that in claiming that the detectives had coerced Friedman. Advising Friedman, who was in custody and could have incriminated himself during the polygraph examination, of his rights was not inappropriate or unnecessary in the instant case.

ny differs from that he or she has given previously." *Smith,* 997 F.2d at 680.

A prosecutor faced with the prospect of an unrepresented defense witness who may be asked to provide self-incriminating testimony can do no more than to advise the witness of the risks he may bring upon himself, presenting this advice in a manner calculated to engender informed and uncoerced decisionmaking on the part of the witness. Where the prosecutor simply provides the witness with a truthful warning, no constitutional violation occurs. [*United States v.] Blackwell,* 694 F.2d [1325,] 1335 (D.C.Cir.1982). Where, however, the substance of what [is communicated] to the witness is "a threat over and above what the record indicate[s] was timely, necessary, and appropriate," the inference that the [government] sought to coerce a witness into silence is strong. *United States v. Simmons,* 670 F.2d 365, 369 (D.C.Cir.1982).

*United States v. Jackson,* 935 F.2d 832, 847 (7th Cir.1991).

[¶ 20] We conclude, as the Seventh Circuit did in *Jackson,* 935 F.2d at 847, that the detectives' response in the instant case did not amount to the " 'highly intimidating' statements, 'excessive in number and badgering in tone or phrasing,' and 'obviously threatening,' that past cases [ (including *Webb* and its progeny) ] have identified as so coercive as to raise constitutional concerns." [12] (Citations omitted.) It was Friedman, not Weinhandl, who initiated the discussion about what might happen if he lied during the polygraph examination. Weinhandl simply responded that because the appellant's case was an ongoing criminal investigation, charges "could" be filed against Friedman if he interfered with that investigation by lying, which could possibly also affect the pending presentence investigation Friedman had mentioned. Importantly, Weinhandl also made it clear that he only sought the truth, even if the truth was what

Friedman had said in his first statement to Tuma (which did not inculpate the appellant). After Friedman indicated that his first statement was partially untrue, the detectives conferred with the district attorney. They then reiterated to Friedman that they only sought the truth and that, whether he deviated from his first statement or not, it would not affect his pending presentence investigation. Friedman agreed to provide a second taped statement, was again advised of his rights, and continued to maintain that his first statement was partially untrue. He also acknowledged that he had not been threatened in any way, particularly with respect to his pending presentence investigation.

[¶ 21] Accordingly, we cannot say that Friedman's representation that his first statement was partially untrue was due to any governmental "threats of prosecution, intimidation, or coercive badgering." The fact that Tuma requested the polygraph examination, during which examination Friedman then claimed that his first statement was partially untrue, does not, *ipso facto,* prove otherwise. The nexus between the government's alleged conduct and the loss of material and favorable trial testimony is also tenuous. The record does not indicate that Friedman was unwilling to testify at the appellant's trial, that he intended to invoke his constitutional right not to testify, or that he was no longer available to the defense, due to improper governmental conduct— Friedman did not testify at the motion hearing and the appellant's trial counsel obviously made a strategic decision not to call Friedman as a trial witness. *See, for example, Kitchen v. United States,* 227 F.3d 1014, 1023–24 (7th Cir.2000) (distinguishing between counsel's decision not to call witness and witness' decision to refuse to testify). We, of course, have no idea what Friedman's trial testimony would have been had either party called him as a trial witness.

---

**12.** The appellant cites numerous cases in his principal and reply briefs as examples of governmental conduct that "can deprive" a defendant of his compulsory process and/or due process rights. We have reviewed these cases, and we do not feel compelled to distinguish them on an individual basis because the cases generally involve government conduct that is more egregious than the conduct at issue in the instant case or conduct that arose in a substantially different context.

### Ineffective Assistance of Counsel

[¶ 22] Two public defenders represented the appellant at trial. On appeal, the appellant contends that his trial counsel were ineffective in several respects. The premise of the appellant's argument is that his trial counsel were obligated to take additional steps in responding to some incidents that arose during the trial. In that regard, the appellant relies on the following excerpt from *Simmons v. State*, 2003 WY 84, ¶ 26, 72 P.3d 803, 812 (Wyo.2003):

At the same time, defense counsel also bears a burden to ensure such potential prejudice is adequately addressed. Where counsel has failed to ask the trial court to admonish the jury, move for a mistrial, or raise an objection to the trial court's response, we have declined to reverse. *See Clegg v. State*, 655 P.2d 1240, 1241–42 (Wyo.1982) (upholding trial court's response when victim called the defendant a goddamn liar during his testimony); *Tryon v. State*, 567 P.2d 290, 293–94 (Wyo.1977) (upholding trial court's response to report that juror received anonymous telephone call concerning prior acts of defendant where defense counsel did not move for mistrial or object); *Gallup [v. State]*, 559 P.2d [1024,] 1026 [ (Wyo.1977) ] (upholding trial court's response to courtroom altercation between victim's father and defendant during victim's testimony where defense counsel failed to object, ask for further admonition, or move for mistrial). In such cases, we inferred defense counsel considered the trial court's response sufficient. *Gallup*, 559 P.2d at 1026; *Tryon*, 567 P.2d at 293. These cases illustrate the point that defense counsel bears a substantial burden to ensure such error is adequately addressed at the time it occurs. Where, as here, defense counsel stood silent while the proceedings were allowed to continue without asking the trial court to admonish the jury, give a corrective instruction, or even inquire of the jury whether it heard any comment from the audience, we hold that no violation of a clear and unequivocal rule of law occurred.

### Standard of Review

[¶ 23] Claims of ineffective assistance of counsel are reviewed under the following standard:

When reviewing a claim of ineffective assistance of counsel, the paramount determination is whether, in light of all the circumstances, trial counsel's acts or omissions were outside the wide range of professionally competent assistance. *Herdt v. State*, 891 P.2d 793, 796 (Wyo. 1995); *Starr v. State*, 888 P.2d 1262, 1266–67 (Wyo.1995); *Arner v. State*, 872 P.2d 100, 104 (Wyo.1994); *Frias v. State*, 722 P.2d 135, 145 (Wyo.1986). The reviewing court should indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Herdt*, at 796, *Starr*, at 1266, *Arner*, at 104; *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

Under the two-prong standard articulated in *Strickland* and *Frias*, an appellant claiming ineffective assistance of counsel must demonstrate on the record that counsel's performance was deficient and that prejudice resulted. *Strickland*, 466 U.S. at 687, 104 S.Ct. at 2064; *Starr*, at 1266; *King v. State*, 810 P.2d 119, 125 (Wyo.1991) (Cardine, J., dissenting); *Campbell v. State*, 728 P.2d 628, 629 (Wyo.1986); *Frias*, 722 P.2d at 145. In other words, to warrant reversal on a claim of ineffective assistance of counsel, an appellant must demonstrate that his counsel failed to "render such assistance as would have been offered by a reasonably competent attorney" and that "counsel's deficiency prejudiced the defense of the case." *Lower v. State*, 786 P.2d 346, 349 (Wyo.1990). "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland*, 466 U.S. at 686, 104 S.Ct. at 2064. *Asch [v. State*, 2003 WY 18,] ¶ 11[, 62 P.3d 945, 950 (Wyo.2003) ] (*quoting Becker v.*

*State,* 2002 WY 126, ¶ 12, 53 P.3d 94, ¶ 12 (Wyo.2002); *Reyna v. State,* 2001 WY 105, ¶ 19, 33 P.3d 1129, ¶ 19 (Wyo.2001); *Chapman v. State,* 2001 WY 25, ¶ 6, 18 P.3d 1164, ¶ 6 (Wyo.2001); *Grainey v. State,* 997 P.2d 1035, 1038–39 (Wyo.2000)). The burden of proving that counsel was ineffective rests entirely on an · appellant. *Asch,* at ¶ 11 (citing *Barkell v. State,* 2002 WY 153, ¶ 10, 55 P.3d 1239, ¶ 10 (Wyo.2002)). To satisfy his burden, an appellant must provide more than mere speculation or equivocal inferences. *Sincock v. State,* 2003 WY 115, ¶ 37, 76 P.3d 323, ¶ 37 (Wyo.2003) (citing *Barkell,* at ¶ 13).

*Duke v. State,* 2004 WY 120, ¶ 36, 99 P.3d 928, 943 (Wyo.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 2513, 161 L.Ed.2d 1113 (2005). We have further stated that the appellant

> must demonstrate the existence of a reasonable probability that, absent that deficiency, the result of the proceedings would have been different. Counsel's ineffectiveness must be so serious as to undermine this court's confidence that the outcome was fair. *Laing v. State,* 746 P.2d 1247, 1248–49 (Wyo.1987); *Gist v. State,* 737 P.2d 336, 342 (Wyo.1987); *Frias v. State,* 722 P.2d 135, 145–47 (Wyo.1986).

*Rutti v. State,* 2004 WY 133, ¶ 23, 100 P.3d 394, 405 (Wyo.2004), *cert. denied,* —— U.S. ——, 125 S.Ct. 1990, 161 L.Ed.2d 858 (2005) (*quoting Lower v. State,* 786 P.2d 346, 349–50 (Wyo.1990)). A failure to "make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." *Strickland v. Washington,* 466 U.S. 668, 700, 104 S.Ct. 2052, 2071, 80 L.Ed.2d 674 (1984). Indeed, if "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Id.,* 466 U.S. at 697, 104 S.Ct. at 2069.

**Victim Buttons**

▮ [¶ 24] The facts relevant to this issue are undisputed. Just prior to beginning the second day of the appellant's trial, the district court, *sua sponte,* consulted counsel for both parties about the propriety of continuing to allow the victim's family to wear certain buttons in the courtroom during the trial. It appears, based on what we can discern from the record, that the buttons at issue said, "We will never forget" and contained a picture of the victim. The district court noted the following while discussing the issue with counsel: 1) the buttons were small enough that it could not see the content of the buttons from the bench (the buttons were not "of such size that [they] could be read"); 2) the jury was positioned so that it faced away from the courtroom spectators, including the victim's family, with ten to fifteen feet separating the two; 3) when the victim's family entered the courtroom wearing the buttons, the jury had already been seated (facing away from the spectators) for the afternoon trial session; and 4) the district court did not see any jurors actually look at the buttons. The prosecutor stated that the victim's family had been instructed not to wear the buttons during jury selection and the record does not indicate that the family disobeyed that instruction.[13] The appellant's trial counsel asked the district court to prohibit the buttons from the courtroom, and the district court ruled that buttons "reflecting either defense or victim" should only be displayed outside the courtroom and outside the presence of the jury.

[¶ 25] On appeal, the appellant claims that the buttons at issue injected an impermissible factor into the appellant's trial and that the buttons therefore "inherently" prejudiced his right to a fair trial. *See generally Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); and *Asch v. State,* 2003 WY 18, 62 P.3d 945 (Wyo.2003).

---

13. On appeal, the appellant claims that the prosecutor's representation indicates that the prosecutor was "coaching the victim's family." That claim is speculative based on the record before us—the prosecutor merely stated that the family members "were instructed not to wear [the buttons] during jury selection[ ]." One could just as easily infer that the prosecutor, if indeed he was the one that gave the instruction, was attempting to accommodate the family's desire to express itself while minimizing any potential prejudice to the appellant. Nevertheless, the appellant's trial counsel did express some concern about this to the district court and we are not certain what more the appellant's counsel were legally obligated to do in that regard.

The appellant contends that his trial counsel were ineffective, despite the fact that the district court ruled in their favor and excluded the buttons, because counsel did not ask the district court also to "make any inquiries of the jury [or] admonish the jury regarding the buttons."

[¶ 26] While the appellant focuses his appellate argument on whether we should presume that his right to a fair trial was prejudiced under the circumstances, it remains his burden to prove that his counsel's performance was deficient. We, of course, "indulge a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." When this issue was raised in the district court, the appellant's trial counsel promptly asked the district court to exclude the buttons, and the district court granted that request. Trial counsel's failure to take any additional action, then, must be viewed in light of the following circumstances:

1) The size of the buttons was not such that their content was apparent from any meaningful distance.

2) It is not clear from the record how many buttons were actually present in the courtroom during the trial.[14]

3) The jury had virtually no opportunity to view the buttons in the courtroom. The only such opportunity was during the afternoon session on the first day of the appellant's trial. The district court convened that session at 2:51 p.m. When the victim's family entered the courtroom wearing the buttons, the jury had already been seated facing the opposite direction. The trial resumed continuously (with no breaks for the jury) until the district court recessed at 5:06 p.m. It is reasonable to infer from descriptions of the courtroom layout that the jury then exited the courtroom without facing the courtroom spectators.

4) Though it is certainly not conclusive as to whether any jurors saw the buttons,

the district court, which had noticed the buttons and observed the jury during the afternoon trial session, informed counsel that it did not see any jurors actually look at the buttons.

5) If the appellant's trial counsel had asked the district court to take any further action, such action would necessarily have focused additional attention on the very buttons that the appellant claims were inherently prejudicial.

We cannot say that, considering these circumstances, the appellant's trial counsel were ineffective.

### Out-of-Court Contact with Jurors

[¶ 27] Prior to beginning the sixth day of the appellant's trial, the district court informed counsel that the bailiff had expressed "some concern" because when "the jurors are exiting, there [are] a number of people in the hallway and they can be overheard talking." The prosecutor asked if the district court knew "of any [particular] conversations" that had been overheard and the district court (who obviously had spoken with the bailiff) responded that it did not "have any conversations noted." In order to prevent such an occurrence thereafter, the district court stated that it would ask the jurors to exit via a different stairwell, would "have any indications of any improper communication reported to" the court, and cautioned the courtroom spectators in open court as follows:

[W]e have jurors that come in and out of the building at various times. And it's important that you be attune[d] to those jurors so that your conversations and statements to one another do not get overheard by those jurors.

It's important that they not be exposed to information or discussions concerning this case outside of the courtroom. And so I would just ask you to be aware of that so that you can be attune[d] to any juror presence and limit your conversation in

---

14. The appellant's trial counsel stated that "in excess of 17 people" he believed to have been associated with the victim's family were present in the courtroom during the morning trial session. However, nothing in the record indicates how many of them (assuming that number to be accurate) attended the afternoon trial session and also wore the buttons.

terms of volume so that that is not overheard.

When the jury recessed for lunch later that morning, the district court also instructed the jury (as it had throughout the trial): 1) not to discuss the case with anyone, including family, other jurors, or anyone involved in the trial; 2) not to speak with any of the parties, witnesses, or attorneys; 3) to immediately tell the bailiff if anyone attempted to talk to them about the trial; and 4) to keep an open mind until they had heard all of the evidence, the closing arguments of counsel, and the court's final instructions.

[¶ 28] The appellant contends that his trial counsel were ineffective because they did not ask the district court to question the jurors about any conversations that they may have overheard or to admonish the jury to disregard anything that it may have overheard. Yet, it is also the appellant's burden on appeal to demonstrate that he was prejudiced by this alleged deficiency. The appellant asks us to presume that he was prejudiced based on the following principle:

> In a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial, if not made in pursuance of known rules of the court and the instructions and directions of the court made during the trial, with full knowledge of the parties. The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

*Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 451, 98 L.Ed. 654 (1954) (citations omitted).[15]

[¶ 29] In order to implicate such a presumption, however, there must be some quantum of evidence indicating that an out-of-court communication or contact occurred and that it concerned "the matter pending before the jury." *See United States v. Brooks,* 161 F.3d 1240, 1246–47 (10th Cir. 1998). It appears from our review of the record that the bailiff in the instant case was merely concerned that the potential for such contact existed, and did not indicate to the district court that she was aware of any inappropriate contact that had actually occurred.[16] We decline to presume prejudice under such speculative circumstances and the appellant does not allege that he was otherwise prejudiced in this regard. Accordingly, the appellant has not satisfied his burden with respect to this issue.

### Sleeping Juror

[¶ 30] On the afternoon of the sixth day of the appellant's trial, the appellant's trial counsel alerted the district court that a particular juror might have slept during the trial for about fifteen minutes the previous day. The district court discussed the matter with counsel for both parties, during which discussion counsel and the court placed their respective observations on the record. Ultimately, the district court indicated that they all should continue to monitor the jurors and that the court would address any subsequent concerns by taking a "stretch break."

[¶ 31] Despite the fact that his trial counsel first alerted the district court to the issue, the appellant argues on appeal that his counsel were ineffective because they did not then "object to the trial court's course of action." It remains the appellant's burden to establish that he was prejudiced by this alleged deficiency. In that regard, the appellant merely declares in his appellate brief that he "was prejudiced." We "have consistently held that we will not consider claims unsupported by cogent argument or pertinent authority." *Barkell v. State,* 2002 WY 153, ¶ 32, 55 P.3d 1239, 1245 (Wyo.2002). We also note that the juror alleged to have been asleep was an

---

**15.** *See generally also United States v. Scull,* 321 F.3d 1270, 1280–81 (10th Cir.2003), *cert. denied,* 540 U.S. 864, 124 S.Ct. 175, 157 L.Ed.2d 116 (2003); *Sisneros v. Laramie,* 773 P.2d 933, 935–37 (Wyo.1989); and *Skinner v. State,* 2001 WY 102, ¶¶ 12–14, 33 P.3d 758, 762–64 (Wyo.2001),

cert. denied, 535 U.S. 994, 122 S.Ct. 1554, 152 L.Ed.2d 477 (2002).

**16.** There is no evidence that a juror or anyone else reported such a contact in response to the district court's instructions.

alternate juror. The district court subsequently discharged the juror and the juror did not deliberate with the jury that reached the verdict in this case.

## Autopsy Photographs

[¶ 32] The appellant's remaining claims concern several autopsy photographs that the district court admitted into evidence during the prosecutor's direct examination of the coroner. The coroner, who autopsied the victim, used the photographs in testifying about his autopsy observations and findings. The photographs apparently were also then published to the jury.

[¶ 33] All but three of these photographs were admitted into evidence without objection. The appellant's trial counsel objected to the remaining three photographs on the basis that they were cumulative of the photographs that previously had been admitted. The district court overruled the objection. On appeal, the appellant contends that his trial counsel were ineffective because they failed adequately to object to the photographs—his trial counsel should have objected to more of the photographs as being "prejudicial" pursuant to W.R.E. 403, rather than objecting to only three such photographs as being "cumulative." While the appellant mentions Rule 403 in advancing this argument, we need not consider this issue further because he does not endeavor to even quote the rule or to cite any other supporting legal authority.

[¶ 34] Interestingly, the appellant then asserts that his trial counsel were ineffective in handling an issue concerning whether a juror failed to examine these allegedly "prejudicial" photographs when the photographs were published to the jury. Following the prosecutor's direct examination of the coroner, the appellant's trial counsel alerted the district court that a particular juror was "putting her eyes down when the [autopsy photographs] were being testified [to] by [the coroner]" and that the appellant's investigator saw the juror "passing the [autopsy photographs] by without looking at them, and actually turning them over." The prosecutor responded that he thought the juror had been looking at the photographs, but not "closely." The district court stated that it had "observed" the juror, and that the juror was "watching when the exhibits are being talked about, but she did pass them up when they were being handed out"—the juror appeared "to be paying attention to the testimony and to the exhibits as [they were] being shown." The district court vowed to "watch that" and if any further concern arose, the court would "then say something" to the juror.[17]

[¶ 35] The appellant contends that a juror's "inability to view the evidence raises concerns of bias" and that his trial counsel should have asked the district court to determine whether the juror could "consider all the evidence and would not be swayed by sentiment over the graphic autopsy photographs." Aside from generally citing the *Simmons* case we previously referenced, the appellant cites only *State v. Clark,* 981 S.W.2d 143 (Mo.1998) in support of this argument. In *Clark,* 981 S.W.2d at 145, the trial court ruled that defense counsel was " 'not entitled to voir dire on specifics of the case being tried,' " including the age of one of the murder victims (a three-year-old girl). Clark argued in his appeal to the Missouri Supreme Court that the trial court had improperly restricted voir dire. *Id.* at 146. The court found that under the circumstances, the victim's age was a "critical fact" that could "implicate personal bias and disqualify prospective jurors," and that the trial court's "sweeping" ruling violated Clark's right to an impartial jury because it prevented the defense from attempting to discover such bias. *Id.* at 147. In evaluating whether this viola-

17. The appellant also claims that the district court observed this same juror crying when the autopsy photographs were published to the jury. However, the district court noted only that the juror "grabbed a Kleenex, but [did not] seem to be crying significantly or anything." The appellant claims that his trial counsel should have requested that the district court inquire as to whether the juror could "carry out her duties properly" and "consider all the evidence." We need not consider this issue further because the argument is not accompanied by any citation to pertinent legal authority and the appellant merely states that he "was prejudiced" by his counsel's alleged deficiency.

tion resulted in a " 'real probability of injury,' " the court considered the prosecutor's emphasis of the victim's age during the trial and that "one juror left the room crying after viewing autopsy photos of" the victim. *Id.* at 147–48. The court ultimately reversed Clark's first-degree murder convictions and remanded the case for a new trial. *Id.* at 148.

[¶ 36] We fail to see how this authority is relevant to the instant case, wherein the appellant does not contend that the district court restricted his ability to *voir dire* prospective jurors. In fact, the prosecutor questioned prospective jurors about their ability to view autopsy photographs and the appellant's trial counsel questioned prospective jurors about their reactions upon seeing dead bodies. The *Clark* case does mention that a juror left the room crying after viewing autopsy photographs of the victim in the context of whether Clark was prejudiced by the district court's ruling in that case. However, the case clearly is not persuasive with respect to the appellant's contentions in the instant appeal. We further note that the district court in the instant case: 1) instructed the jury to "keep an open mind until you have heard all the evidence in this case ..." when recessing for lunch immediately after the autopsy photographs were published to the jury; and 2) instructed the jury as follows just before they were to begin deliberating:

> On the other hand, it is the exclusive province of the jury to weigh and consider all evidence which is presented to it; to determine the credibility of all witnesses and evidence, to determine the issues of fact in this case.
>
> This duty you shall perform with sincere judgment, and sound discretion, uninfluenced by pity for or passion or prejudice against any of the litigants in this case. The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling. The litigants have the right to demand and expect that you will conscien-

tiously and dispassionately consider and weigh the evidence and apply the law of the case, and that you will reach a just verdict, regardless of what the consequence of such a verdict may be.[18]

[¶ 37] The appellant also claims that a local newspaper article reported that "audible gasps" could be heard from where the victim's family was seated in the courtroom "as graphic pictures of [the victim's] body at autopsy were circulated among the jury." This information does not appear in the record on appeal—the appellant asks that we 'simply take judicial notice of the article.[19] According to the appellant, the jury "most likely heard" the "audible gasps" referenced in the article, his trial counsel should have acted to ensure that the district court took "appropriate action," and he "was prejudiced" by this "omission."

[¶ 38] We find the appellant's argument to be deficient in several respects. The only pertinent legal authority cited by the appellant (aside from some authority on judicial notice) is 75 Am.Jur.2d *Trial* § 254 (1991), which section addresses demonstrations and outbursts by trial spectators. The excerpt cited by the appellant, however, specifically refers to "misconduct ... calculated to influence the jury." The alleged conduct referenced in the article certainly, in the absence of additional information, does not rise to that level and cannot even be attributed to a particular individual or individuals. The appellant also fails to specify in his appellate brief what his trial counsel should have done, what would have constituted "appropriate action" by the district court, and, again, merely states that he "was prejudiced" by this unspecified deficiency. The appellant clearly has not satisfied his burden with respect to this issue.

### Sentencing

[¶ 39] The appellant raises two appellate issues regarding his sentence. He first claims that Wyo. Stat. Ann. § 6–2–101 [20]

---

18. The district court had given the jury a similar instruction prior to opening statements.

19. We do not express any opinion regarding the propriety of taking judicial notice of the article.

20. Wyo. Stat. § 6–2–101 provides, in pertinent part, as follows:

is unconstitutional essentially because in a non-capital case, "it allows a defendant to be sentenced to the penitentiary with no chance at ever again enjoying the right to liberty, solely on the whim of a judge" and "without any guidelines for when [a life sentence without the possibility of parole] is to be imposed." The appellant cites examples from other states that require "the jury to [first] find additional facts" in order to impose a life sentence without the possibility of parole or that a particular aggravating circumstance justify the sentence. According to the appellant, "[s]uch arbitrariness" in Wyoming violates the appellant's due process rights under the United States and Wyoming Constitutions.

[¶ 40]   We must first consider the manner in which this issue was raised in the district court. *See Hyde v. State,* 769 P.2d 376, 381 (Wyo.1989) (we "have held that we will not consider a constitutional challenge raised for the first time on appeal" unless it involves fundamental error affecting a substantial right of the appellant or involves the jurisdiction of the court). In *Hyde,* 769 P.2d at 381 (*quoting Jackson v. State,* 624 P.2d 751, 755 (Wyo.1981)), we stated that " '[c]onstitutional questions are too important to be answered unless fully and properly presented. It is necessary that the constitutional questions be specifically phrased and completely argued before it would be proper for this court to pass upon them.' "

[¶ 41]   It is clear from the record that the only cogent basis for the appellant's objection to his sentence in the district court was that it is contrary to *Apprendi v. New Jersey,* 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). At sentencing, the appellant's trial counsel stated only that the statute was unconstitutional because it violates the appel-

(a) Whoever purposely and with premeditated malice . . . kills any human being is guilty of murder in the first degree.
(b) A person convicted of murder in the first degree shall be punished by death, life imprisonment without parole or life imprisonment according to law. . . .
(c) A person convicted of murder in the first degree in a case in which the state seeks the death penalty shall be sentenced in accordance with the provisions of W.S. 6–2–102. In all other cases, including any case in which the

lant's "due process rights under the state and Federal constitutions. That it is denying him his Sixth Amendment rights in accordance with *Apprendi* . . . ." The prosecutor responded to this contention by arguing that *Apprendi* did not apply to the statute at issue, and the district court ruled that there was no "basis for argument pursuant to *Apprendi.*"

[¶ 42]   Merely stating that the statute is unconstitutional because it violates the appellant's "due process rights" is too conclusory an assertion to permit our review in the instant case.[21] *See Daley v. Wenzel,* 2001 WY 80, ¶ 22, 30 P.3d 547, 553 (Wyo.2001) ("conclusory assertion hardly satisfies the well-established requirement of 'formally raising or arguing' the constitutional claims to the trial court as required by this Court.") (citation omitted). To the extent that the appellant claimed that Wyo. Stat. Ann. § 6–2–101 is somehow contrary to the United States Supreme Court's decision in *Apprendi,* we have previously rejected that argument and the appellant has not renewed that argument on appeal. *See Kenyon v. State,* 2004 WY 100, ¶ 13, 96 P.3d 1016, 1022 (Wyo. 2004), *cert. denied,* 543 U.S. 1175, 125 S.Ct. 1389, 161 L.Ed.2d 158 (2005).

[¶ 43]   The appellant also contends that his due process right to be sentenced only on accurate information was violated because the presentence investigation report contained the following unverified and "unproven, unreliable hearsay":

As the Defendant could not answer any questions pertaining to the crime itself, this [probation and parole] Agent does not know if the Defendant feels any remorse for his actions nor does this Agent know if

state has determined not to seek the death penalty at any stage of the proceeding, the judge shall determine the sentence of life imprisonment without parole or life imprisonment taking into consideration any negotiated plea agreement and any evidence relevant to a determination of sentence which the court deems to have probative value.

21.   The appellant does not argue that this issue is fundamental in nature or involves the jurisdiction of the court.

the Defendant takes any responsibility for his actions. However this Agent feels the Defendant must not take responsibility as he has consistently denied any culpability in this case *even though he was the only one known to be in the home besides the victim and two (2) children. According to reports this Agent read during this investigation, the two (2) children both made statements about seeing the Defendant harm their mother. In fact the male child has stated "daddy shot mommy" and the female child has stated "mom would be mad if I told you what happened."*

(Emphasis added.) The appellant essentially claims that this information is unreliable because it "does not identify what reports [the agent] was reading that supported this conclusion" and "does not identify to whom the children made these statements or under what circumstances the statements were made."

[¶ 44] The district court generally referred to this information, as well as several other considerations, in sentencing the appellant. It noted that "while [the appellant] was consumed with the beating of his wife, their two children ... experienced a living nightmare which will undoubtedly be forever etched in their minds," and stated that "time will determine the ultimate impact upon [the appellant's children.] One hopes, despite the witnessing of their mother's murder, that they will overcome this loss. With the love and assistance of family members, they can and will persevere."

[¶ 45] Our standard of review for issues of this nature is as follows:

When imposing sentence, the trial court is given broad discretion to consider a wide variety of factors about the defendant and his crimes. *Mehring v. State*, 860 P.2d 1101, 1115 (Wyo.1993); *Griebel v. State*, 763 P.2d 475, 477 (Wyo.1988). We will not disturb a sentencing decision absent a clear abuse of discretion. *Jones v. State*, 771 P.2d 368, 371 (Wyo.1989). In sentencing, due process provides a right to be sentenced only on accurate information. *Mehring*, 860 P.2d at 1117; *Clouse v. State*, 776 P.2d 1011, 1014 (Wyo.1989). On

appeal, the defendant must demonstrate that the trial court relied upon the statements in sentencing to prevail. *Mehring*, at 1115. "However, when no objection is made concerning the consideration of a particular factor, review is necessarily confined to a search for plain error. Plain error, as we have often stated, occurs when the record clearly shows an error that transgressed a clear and unequivocal rule of law which adversely affected a substantial right." *Hornecker v. State*, 977 P.2d 1289, 1291 (Wyo.1999); *see also Craver v. State*, 942 P.2d 1110, 1115 (Wyo.1997).

*Manes v. State*, 2004 WY 70, ¶ 9, 92 P.3d 289, 292 (Wyo.2004).

Wyoming does not permit a sentencing decision based upon unreliable information, undocumented information, or inaccurate information. *Mehring*, 860 P.2d at 1117; *DeLoge v. State*, 2002 WY 155, ¶ 13, 55 P.3d 1233, ¶ 13 (Wyo.2002).

*Id.*, 2004 WY 70, ¶ 13, 92 P.3d at 293. In *Bitz v. State*, 2003 WY 140, ¶ 14, 78 P.3d 257, 260–61 (Wyo.2003), we further stated:

In *Christy [v. State]*, 731 P.2d [1204,] 1207–08 [ (Wyo.1987) ], we determined that the trial court may consider "filed reports and information" at sentencing, so long as the defendant is given the opportunity "to deny, dispute, or disprove." Two years later, in *Smallwood [v. State]*, 771 P.2d [798,] 802 [ (Wyo.1989], we described this as "an opportunity to rebut pre-sentence information which is materially false or which furnishes invalid premises for the sentence which the judge is imposing." In *Clouse [v. State]*, 776 P.2d [1011,] 1015 [ (Wyo.1989) ], we made clear that it is the defendant's obligation to object to any sentencing information he contends is inaccurate. And in *Johnson [v. State]*, 790 P.2d [231,] 236 [ (Wyo.1990) ] (*quoting Christy*, 731 P.2d at 1208), we stated that objecting is not alone sufficient and we reiterated that a defendant must challenge the accuracy of the information and has the duty to "deny, dispute, or disprove" it.

*See also* W.R.Cr.P. 32(a).

[¶ 46] We first note that, contrary to the appellant's argument, other information con-

tained in the presentence investigation report supports the passage to which he now objects. The report quotes the sworn affidavit that was filed in support of the Information charging the appellant with first-degree murder. That affidavit states that on September 8, 2003, Mike Baden and Donna Allred (trained forensic interviewers employed by the Department of Family Services) each interviewed one of the appellant's two children. One child stated that he or she was present when the appellant and the victim "became involved in an argument," that the victim "had been harmed by the gun," and that the appellant had been "cleaning up blood at the residence." The other child stated that he or she saw "an individual, identified by the content of the conversation as [the appellant], shoot an individual, identified by the content of the conversation as [the victim,] in the face with a gun."

[¶ 47] Furthermore, the district court expressly provided the appellant an opportunity to dispute the passage at issue during his sentencing hearing. Prior to the August 13, 2004 sentencing hearing, the State filed a notice of its intent to present Mike Baden's and Donna Allred's testimony as to the children's observations the day the victim was murdered, and videotapes of their interviews of the children. The appellant's trial counsel objected to the presentation of such evidence. However, in discussing the appellant's objection with the district court, the prosecutor indicated more than once that there would be no need to present the evidence if the appellant did not dispute the information contained in the presentence investigation report. The district court then inquired as to whether the appellant had any "additions, corrections, or modifications that [he believed to be] necessary to verify the factual [accuracy] of the materials set forth" in the report. The appellant's trial counsel directed the district court to two such issues, but never sought to deny, dispute, or disprove the information that the children were present during the murder. That being the case, we cannot find on the record before us that the district court sentenced the appellant based

on unreliable, undocumented or inaccurate information.

[¶ 48] Affirmed.